PEOPLE v CHARLES

1. WITNESSES—JURY—QUESTIONING OF WITNESSES—QUESTIONING BY JURY.

The questioning of witnesses by jurors and the method of submission of such questions rests in the sound discretion of the trial court, and it is error for the judge to rule that under no circumstances might a juror ask any questions.

2. COURTS—INSTRUCTIONS TO JURY—INACCURATE INSTRUCTIONS—LACK OF OBJECTION—MISCARRIAGE OF JUSTICE—APPEAL AND ERROR.

A trial court is bound to follow the law notwithstanding the fact that it is not called to the court's attention, but only the occurrence of a miscarriage of justice will necessitate reversal where a judge gives an inaccurate instruction to the jury and has no way of knowing that it is no longer an accurate statement of the law and no objection is made by counsel.

3. WITNESSES—QUESTIONING WITNESSES—QUESTIONING BY JUROR—APPEAL AND ERROR—HARMLESS ERROR.

It is error but not reversible error, where a witness is erroneously prevented from answering a question asked by a juror but where the same information which would have been given is otherwise related to the jury.

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 4 Am Jur 2d, Appeal and Error §§ 79, 80.
[2] 75 Am Jur 2d, Trial §§ 693, 906–909.
[4] 21 Am Jur 2d, Criminal Law § 118.
  29 Am Jur 2d, Evidence § 638 *et seq.*
[5] 58 Am Jur 2d, New Trial § 56.
  75 Am Jur 2d, Trial § 192.
[6] 41 Am Jur 2d, Indictment and Information §§ 171–208.
[7] 30 Am Jur 2d, Evidence § 1086.
[8] 40 Am Jur 2d, Homicide §§ 265–267.
  Homicide: presumption of deliberation or premeditation from the circumstances attending the killing. 96 ALR2d 1435.
[9] 5 Am Jur 2d, Appeal and Error § 553.
[10, 11] 21 Am Jur 2d, Criminal Law §§ 368, 369.
[12] 5 Am Jur 2d, Appeal and Error § 624.
[13] 5 Am Jur 2d, Appeal and Error § 545.

4. Constitutional Law—Right to Remain Silent—Prior Inconsistent Statements—Comment on Inconsistency—Prosecutors.

A prosecutor may not attempt at trial to use a defendant's exercise of his right to remain silent at the time of his arrest as evidence of his guilt, but where the defendant has made prior statements which are inconsistent with his testimony at trial, the prosecutor may point out the inconsistency.

5. Appeal and Error—Prosecutors—Improper Remarks—Harmless Error.

A conviction will not be reversed because a prosecutor has made improper remarks where there is no reasonable possibility that the remarks could have contributed to the defendant's conviction.

6. Indictment and Information—Statutes—Specificity—Citation.

An information will not be held inadequate where it is drafted with greater specificity than provided for by statute and where a citation to the statute defining the offense is included on the face of the information.

7. Motions—Motion for Directed Verdict—Criminal Law—Evidence—Elements of Crime—Light Favorable to Prosecution.

The question presented by a motion for a directed verdict of not guilty is whether there is evidence from which a jury can reasonably infer all of the elements of the crime charged, and the state's evidence must be taken as true and it must be viewed in the light most favorable to the state.

8. Homicide—First-Degree Murder—Elements—Premeditation and Deliberation—Inference—Weapon—Wound—Circumstances.

The elements of premeditation and deliberation necessary to prove first-degree murder may be inferred from the character of the weapon used, the wound inflicted and the circumstances surrounding the killing.

9. Witnesses—Criminal Law—Defendant as Witness—Impeachment—Prior Convictions—Appeal and Error—No Prejudice—No Objection.

An inadvertent error made by the prosecutor while attempting to impeach the defendant's credibility by examining him concerning his prior convictions, which improperly reveals details of a prior conviction to the jury, will not result in reversal where the error caused no prejudice to the defendant and no objection was made.

10. HOMICIDE—MURDER—EVIDENCE—PHOTOGRAPHS—BALANCING TEST
—MATERIAL FACTS—PREJUDICE—MOTIVE—ABUSE OF DISCRETION.

A court must apply a balancing test to determine whether photographs of a victim admitted at a murder trial over defendant's objection were substantially necessary or instructive to show material facts or conditions, or whether they were merely calculated to excite passion and prejudice; and where the photographs are of substantial probative value and material to proving premeditation and deliberation and there is no suggestion of improper prosecutorial motive, their admission is not an abuse of the trial judge's discretion.

11. APPEAL AND ERROR—INSTRUCTIONS TO JURY—PHOTOGRAPHS—PRESERVING QUESTION.

A defendant may not assign as error the failure of a trial court to give an instruction restricting the purposes for which the jury could consider photographs of the deceased where no limiting instruction was requested.

12. APPEAL AND ERROR—CLOSING ARGUMENT—PREJUDICIAL EFFECT—TIMELY OBJECTION.

Prejudicial comments by the prosecution in its closing argument which were not objected to will not result in reversal of a conviction unless their prejudicial effect was so great that it could not have been cured by a timely objection and a cautionary instruction.

13. APPEAL AND ERROR—WITNESSES—RES GESTAE WITNESSES—PRESERVING QUESTION—INDORSEMENT—CUMULATIVE EVIDENCE.

A defendant may not argue for the first time on appeal that a witness who allegedly heard the defendant admit committing the crime is an indispensable res gestae witness where the identity of the witness was well known to the defendant long before trial and he did not move for production or indorsement of the witness and the testimony would merely be cumulative.

Appeal from Washtenaw, William F. Ager, Jr., J. Submitted Division 2 January 7, 1975, at Lansing. (Docket No. 18248.) Decided February 10, 1975.

Glenn G. Charles was convicted of first-degree murder. Defendant appeals. Affirmed.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William F. Delhey,* Prosecuting Attorney, and *John J. Hensel,* First Assistant Prosecuting Attorney, for the people.

*Roger L. Wotila,* Assistant State Appellate Defender, for defendant.

Before: Danhof, P. J., and McGregor and Walsh, JJ.

Danhof, P. J. Defendant was convicted of first-degree murder, MCLA 750.316; MSA 28.548, and given the mandatory sentence of life imprisonment. One year later, his application for delayed appeal was granted. He raises numerous issues, the merits of which vary greatly, but none of which necessitate reversal.

On July 26, 1971 the body of Mr. Theodore Ziefle was discovered in the foyer of his home by his half brother and members of the Ann Arbor Police Department. The body, clad only in a pair of trousers, was found in the front hallway at the foot of the stairs leading to the second floor. Decedent's head had been badly battered and he was lying on his back in a pool of blood. A lamp from which the electrical cord had been removed was found near the body, as were parts of a wooden clothes hanger. The electrical cord itself was wrapped and knotted around the decedent's neck.

The bedroom was in disarray, and a collection of silver coins totalling at least $100 in face value was missing from the closet. Five bank passbooks and an old style camera were also taken. The decedent's automobile, a Buick Skylark, was not in the garage.

Medical examination of the body disclosed that Mr. Ziefle had died on July 24 or 25, 1971. Death

was caused by strangulation resulting from the knotting and twisting of the electrical cord around decedent's neck so tightly that it was buried in the layers of skin which were swollen and discolored. Clotted blood and mucus material filled the mouth and nasal passages, and the decedent's tongue was engorged and protruding. A bone located in the throat just above the voice box called the hyoide was fractured at three places. The body showed evidence of a severe beating including abrasions and contusions around the eyes and nose, and an area of thickening and swelling in the back of the head.

An alert to watch for Mr. Ziefle's 1965 Buick automobile was teletyped to the police agencies in Michigan. Mr. Ziefle's house was examined by technical experts who discovered blood of decedent's type in the bathroom sink, and hair samples matching his on the banister leading to the second floor. No unaccounted for latent fingerprints were found. Photographs of the entire area were taken, including the front porch where two newspapers were still lying.

On July 30, 1971 two Grand Rapids police officers on patrol noticed a 1965 Buick which conformed to the description sent out by the Ann Arbor police department. They were able to apprehend the driver, who was later identified as the defendant, after a chase by automobile and on foot. Two women were in the car with the defendant when he was arrested.

The women had come to know the defendant through a meeting in a Grand Rapids park. The defendant told a number of people in the park that he was driving a "hot car", and that its owner was dead. He went on to inform them that he murdered a man in Ann Arbor, took his car, and

that the man was a sexual deviate. He explained how long it takes to strangle a person, boasting that his hands were deadly weapons, and listing the items, including old silver coins, that he had stolen. Some of the items given by the defendant to the women were later identified as having belonged to decedent.

Defendant testified that he was a prison escapee, and that on the night of July 24, 1971 he went to a movie in an Ann Arbor theater. Later that night, he stated that he discovered the decedent's automobile in a parking lot behind a tire store with the keys in the ignition. He took the car and went directly to Grand Rapids where he subsequently discovered the various possessions of the decedent in the trunk.

## I

Near the midpoint in the trial, an unidentified member of the jury sent a note to the trial judge inquiring whether or not they could ask a question of two of the witnesses. The juror was interested in knowing the dates of the two newspapers found on the porch of the decedent's house. The question was to be directed to a police officer who took the photographs of the scene, or to decedent's brother who was with the police officers when the body was discovered. In response to this inquiry, the trial court gave the following instruction to the jury:

"Again, as I told you yesterday, don't talk about the case with anyone, don't discuss it with each other until you've heard all the testimony. I might state this in answer to a question the jury can't ask questions. Some jurisdictions maybe they permit the jury to ask questions but we can't permit the jury to ask questions. If you have a question in your mind we can't help you

under our system in Michigan. A jury is not permitted to ask questions. But if you don't hear anything of course then you stand up or shout or raise your hand, let us know about it if you don't hear something, but not to ask questions. Alright, tomorrow morning, 9:00, don't read the paper anything like that, that has anything to do with this case."

This instruction was erroneous. The propriety of permitting jurors to question witnesses was characterized by our Supreme Court in *People v Heard,* 388 Mich 182; 200 NW2d 73 (1972) as an issue of first impression in the State of Michigan. After analyzing the resolution of this issue in other jurisdictions, the Court decided the question for this State:

. "We hold that the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court. The trial judge may permit such questioning if he wishes, and we hold that it was error for the judge to rule that under no circumstances might a juror ask any questions." *People v Heard, supra,* 388 Mich 188.

Although the error in the trial court's instruction is now manifest, it was not at all evident at the time of trial. The *Heard* case was decided on August 30, 1972. The advance sheets containing this opinion were mailed on or about October 3, 1972. Trial in the present case began on September 25, and the complained of instruction was given to the jury by the learned trial judge on September 26, 1972. Thus, while technically there is no problem with retroactivity in that this case was tried after the date of the decision in *Heard,* the trial judge had no way of knowing that the instruction he gave was no longer an accurate statement of the law.

An analogous problem was presented to this

Court in *People v Glover,* 47 Mich App 454; 209
NW2d 533 (1973). In that case, the prosecution's
chief witness was a 16-year-old boy whose credibil-
ity defense counsel sought to impeach by use of his
juvenile record. The trial court gave both parties
15 minutes to research the law on this point.
Relying on what the trial court, defense counsel,
and the prosecutor conceived to be the current
state of the law, the trial court refused to permit
the juvenile records to be used for impeachment
purposes and instructed the jury not to consider
any of the previously permitted testimony having
to do with the witness's juvenile court record. On
appeal, this Court discussed the practical difficul-
ties inherent in a situation of this kind:

"The law at the time of defendant's trial clearly
permitted the use of a juvenile record for the impeach-
ment of a witness who, as here, was not himself a
defendant. *People v Davies,* 34 Mich App 19; 190 NW2d
694 (1971); *People v Basemore,* 36 Mich App 256; 193
NW2d 335 (1971). *Davies* and *Basemore* were printed in
the advance sheets approximately three months and
two weeks respectively before the start of defendant's
trial. These cases represented a shift of the law, and we
do not deem either the prosecutor or the defense coun-
sel negligent in failing to discover them within the 15
minutes allocated to research the impeachment ques-
tion. However, the trial court was bound to follow the
law notwithstanding the fact that it was not called to
the court's attention." *People v Glover, supra,* 47 Mich
App 457, 458.

Concluding that the trial court erred, the opin-
ion points out that no objection to the ruling and
instruction was made at trial, and that review
must be confined to ascertaining whether or not a
miscarriage of justice has occurred. This is the
standard generally applicable to issues raised for
the first time on appeal without benefit of preser-

vation by timely objection in the lower court, and to allegations of instructional error in particular. GCR 1963, 516.2, MCLA 769.26; MSA 28.1096; *People v Mitten,* 44 Mich App 64; 205 NW2d 47 (1972); *People v Bradley,* 54 Mich App 89; 220 NW2d 305 (1974); *People v Adams,* 48 Mich App 595; 210 NW2d 888 (1973). It has been held that, in the absence of a timely objection or request, this standard must be satisfied to invoke the rule in *Heard. People v Justice,* 50 Mich App 55; 212 NW2d 762 (1973), *lv den,* 391 Mich 792 (1974).

Understandably in the present case, no objection to the trial court's ruling and instruction was made. Therefore, we have closely examined the record in an effort to determine if this error has resulted in a miscarriage of justice necessitating reversal. We conclude that it has not.

The information concerning the newspapers on the porch which was requested from the two witnesses named in the note was later provided by two other prosecution witnesses. A police detective testified extensively with respect to the newspapers, establishing that the two papers found on the porch were the Ann Arbor News for Sunday, July 25, and Monday, July 26, 1971; while the papers for Friday, July 23 and Saturday, July 24 were found in the kitchen of decedent's house. Later in the trial, another detective confirmed the discovery of the newspapers on the front porch. Where a witness is erroneously prevented from answering a question, but the same information which would have been given is otherwise related to the jury, the error will not in itself require reversal. *People v Berrier,* 48 Mich App 454; 210 NW2d 506 (1973), *lv den,* 390 Mich 813 (1973).

The information which might have been elicited from the witnesses had the jury been allowed to

submit questions to them could very conceivably have been damaging to defendant's case. For example, the newspapers were of some probative value in establishing the time of Mr. Ziefle's death. Thus, defense counsel may have elected not to raise any objection to the trial court's ruling and instruction as a matter of trial tactics to prevent the jury from uncovering weaknesses in the defendant's case. *People v Burks,* 48 Mich App 484; 210 NW2d 495 (1973); *People v Carter,* 54 Mich App 69; 220 NW2d 330 (1974).

In *Heard,* defense counsel raised the issue of juror questioning of witnesses in his opening statement and pursued the issue throughout the lengthy discussion reproduced in the Supreme Court's opinion. *People v Heard, supra,* 388 Mich 184–186. Defense counsel intended to incorporate jury participation as a part of his trial strategy. There is absolutely no doubt that the question there was properly preserved for appellate consideration.

## II

Defendant argues that the prosecutor elicited from him on cross-examination testimony which indicated that he had exercised his right to remain silent at the time of his arrest. This argument is not supported by the facts of the case. Before the defendant took the stand, Detective LeVanseler testified that the defendant had told him shortly after his arrest that he had taken decedent's car from the vicinity of Washtenaw and Hill Streets in the City of Ann Arbor. On direct examination, the defendant testified that he took the car from the parking lot of a tire store located next to the county jail. The defendant's appellate counsel quotes a small passage from the trial transcript to

support his claim that the prosecutor inquired concerning defendant's decision to exercise his right to remain silent. Consideration of a slightly greater portion of the transcript of the prosecutor's cross-examination of the defendant discloses that the prosecutor was not referring to the defendant's exercise of his right to remain silent; rather, he was asking the defendant why, if that version were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street:

"*Q. (by the prosecuting attorney):* Now, this Kelly's Tire Company, that's right next to the bus station, isn't it?

"*A. (by defendant):* That's correct.

"*Q.* And, the bus station and Kelly's Tire are right next to the Washtenaw County Jail are they not?

"*A.* They are.

"*Q.* And, when you're standing in the Washtenaw County Jail looking out the window you can look right out and see the bus station and Kelly's Tire, can you not?

"*A.* That's correct.

"*Q.* So, you've had plenty of opportunity from — well, first you spent some time in the Washtenaw County Jail, haven't you?

"*A.* Quite a bit.

"*Q.* And, you have had plenty of opportunity to look out that window and see the bus station and Kelly's tire?

"*A.* That's right.

"*Q.* And, you've seen cars being parked there, isn't that right?

"*A.* That's correct.

"*Q.* Is this where you got the idea to come up with the story that you took a car from that location?

"*A.* No, the reason I came up with that is because it's the truth.

"*Q.* It's the truth?

"*A.* That's right.

"*Q.* Don't you think it's rather odd that if it were the truth that you didn't come forward and tell anybody at the time you were arrested, where you got that car?

"*A.* I wasn't charged with auto theft, I was charged with murder.

"*Q.* Didn't you think at the time you were arrested that possibly the car would have something to do with the charge of murder?

"*A.* When I tried to talk to my attorney they wouldn't let me see him and after that he just said to keep quiet.

"*Q.* This is a rather recent fabrication of yours isn't it not?

"*A.* No, it isn't.

"*Q.* Well, you told Detective LeVanseler back when you were first arrested, you stole the car back on Washtenaw and Hill Street?

"*A.* Never spoke with Detective LeVanseler.

"*Q.* Never did?

"*A.* Right, except when Detective Hall and Price were there and then it was on tape."

Any reference to the defendant's communicativeness at the time of his arrest went to show the inconsistency between defendant's testimony at trial that he did not speak to Detective LeVanseler concerning the car, and his earlier statement to the detective that he took the car from the vicinity of Hill and Washtenaw Streets. cf. *People v Graham,* 386 Mich 452; 192 NW2d 255 (1971). The prosecutor's question was by no means an attempt to use defendant's silence as evidence of his guilt. The question was designed to elicit information from the defendant concerning a prior statement which was inconsistent with his testimony at trial. *People v Taylor,* 44 Mich App 640; 205 NW2d 884 (1973), *lv den,* 389 Mich 810 (1973). Furthermore, there is no reasonable possibility that the passing

remark of the prosecutor could have contributed to the defendant's conviction. *People v Swan,* 56 Mich App 22; 223 NW2d 346 (1975).

## III

Defendant contends that the information filed in this case was defective in that it did not adequately differentiate between first and second degree murder by including reference to the elements of premeditation and deliberation, and that because of this, the defendant's conviction should be reversed. The information was drafted with greater specificity than provided for by statute. See MCLA 767.44; MSA 28.984; MCLA 767.71; MSA 28.1011. A citation to the statute defining first-degree murder, "MSA 28.548", is included on the face of the information. The information was not defective. *People v Strutenski,* 39 Mich App 72; 197 NW2d 296 (1972), *lv den,* 387 Mich 785 (1972).

## IV

Arguing that the prosecution failed to prove premeditation and deliberation, defendant contends that the trial court erred by denying his motion for a directed verdict of not guilty as to first-degree murder. This contention cannot be accepted.

The question which is presented by a motion for a directed verdict of not guilty is whether there is evidence from which a jury can reasonably infer all of the elements of the crime charged. *People v Moore,* 51 Mich App 48; 214 NW2d 548 (1974); *People v Compton,* 23 Mich App 42; 178 NW2d 133 (1970). In determining whether or not there was sufficient evidence on each essential element of the

offense of first-degree murder to submit the case to the jury, the state's evidence must be taken as true, and it must be viewed in the light most favorable to the state, so that the state benefits from every reasonable inference to be drawn therefrom. *People v Watkins,* 36 Mich App 380; 193 NW2d 914 (1971), *affirmed* 388 Mich 717; 202 NW2d 780 (1972). If there is any evidence at all on each of the elements of first-degree murder, the motion should be denied and the trial should proceed to allow the jury to decide whether or not the evidence is sufficient to establish guilt beyond a reasonable doubt. *People v Wesley Brown,* 35 Mich App 153; 192 NW2d 281 (1971), *lv den,* 386 Mich 768 (1971). The elements of premeditation and deliberation necessary to prove first-degree murder may be inferred from the character of the weapon used, the wound inflicted, and the circumstances surrounding the killing. *People v Lem Dumas,* 25 Mich App 173; 181 NW2d 89 (1970), *lv den,* 384 Mich 800 (1971); *People v Griner,* 30 Mich App 612; 186 NW2d 800 (1971); *People v Macklin,* 46 Mich App 297; 208 NW2d 62 (1973).

The evidence produced by the prosecution in the present case was more than adequate to permit the jury to find premeditation and deliberation. An electrical cord was removed from a lamp, knotted on both ends, and wrapped a number of times around the decedent's neck. A wooden hanger was found near the body with indications that it had been used to apply added pressure to the cord. The cord was deeply embedded, breaking a bone in the neck and causing death by strangulation. The house was in disarray and evidence of blood and hair was discovered indicating that a struggle had begun on the second floor ending in the first floor foyer where the severely beaten body was found.

The trial court did not err in denying the motion
for a directed verdict as to first-degree murder.

V

While attempting to impeach the defendant's
credibility by examining him concerning prior con-
victions, the prosecutor asked the defendant if he
had been convicted of embezzlement on April 16,
1970 in Wyoming, Michigan. Defendant denied the
conviction, although his police record, which subse-
quently was determined to be incorrect, listed the
offense along with many others. In an attempt to
clarify the conviction under discussion, the prose-
cutor asked the defendant if he spent 30 days in
jail as a result of it. At that time, the defendant
replied that the conviction was for petty larceny,
not embezzlement. On appeal, defendant's appel-
late counsel argues that the prosecutor's question
constituted reversible error because it was asked
in order to improperly reveal details of the prior
conviction to the jury.

It is apparent that when considered in the con-
text in which it occurred, the prosecutor's inadver-
tent error caused no prejudice to the defendant;
and since no objection was made, we find no
reversible error. *People v Peay,* 37 Mich App 414;
195 NW2d 75 (1971), *lv den,* 388 Mich 795 (1972).

VI

Of the many photographs taken by the police at
the scene of the murder, two were admitted into
evidence over defendant's objection. On appeal,
defendant maintains that they served no purpose
other than to inflame the jury, and that the trial
court committed reversible error by allowing their
admission.

Resolution of this issue requires application of the balancing test formulated in *People v Edding-ton,* 387 Mich 551; 198 NW2d 297 (1972), and restated in *People v Falkner,* 389 Mich 682; 209 NW2d 193 (1973). The court must determine whether the photographs were "substantially necessary or instructive to show material facts or conditions", or whether they were merely "calculated to excite passion and prejudice".

One of the photographs was taken from near the second floor of the house looking down the stairwell approximately where the decedent, according to the prosecutor's theory, fell to the foyer striking the banister with his head. The second photograph was taken from a position closer to the body. It depicted the technique used to effectuate the strangulation, including details of the looped and knotted lamp cord embedded in the neck, and the location of the wooden clothes hanger used, again according to the prosecution's theory, to assist in the generation of the force necessary to cause the extensive damage to the internal structures of the decedent's neck. This photograph also illustrated the condition of the decedent's face which tended to establish that he had been severely beaten before he was killed, possibly elsewhere in the house, such as on the second floor where the prosecution argued the altercation began.

Therefore, the photographs were of substantial probative value. They were material to proving premeditation and deliberation. *People v Fullwood,* 51 Mich App 476; 215 NW2d 594 (1974). While they are certainly not pleasant, there is no suggestion that they were offered out of any improper prosecutorial motive. *People v Banks,* 50 Mich App 622; 213 NW2d 817 (1973). The trial court carefully considered the arguments of the parties, and

in a thoughtful detailed ruling extending over five pages of trial transcript, concluded that the photographs were admissible. Our consideration of this issue leads us to the same conclusion; "The admission of the photographs could not be said to be an abuse of the trial judge's discretion". *People v Eddington, supra,* 387 Mich 562. No limiting instruction was requested. Defendant cannot now assign as error the failure to give such an instruction restricting the purposes for which the jury could consider the photographs. GCR 1963, 516.2.

## VII

During cross-examination of the defendant and during his closing argument to the jury, the prosecutor made certain comments which the defendant now argues were reversibly erroneous as expressing a personal belief in the defendant's guilt, and as disclosing facts not in evidence. The allegedly prejudicial remarks are extracted from various parts of the lengthy trial transcript, and reproduced in isolation from the context in which they occurred. We have considered the purportedly prejudicial utterances of the prosecutor as they appear in the trial transcript, and we note the conspicuous fact that not a single objection to any of these remarks was made at trial. As a result, the applicable well recognized rule precludes reversal of the defendant's conviction unless the prejudicial effect of the prosecutorial comments was so great that it could not have been cured by a timely objection and a cautionary instruction. *People v Giacalone,* 52 Mich App 428; 217 NW2d 444 (1974); *People v White,* 54 Mich App 342; 220 NW2d 789 (1974); *People v Plozai,* 50 Mich App 131; 212 NW2d 721 (1973). Our examination of these remarks leads us to conclude that their prejudicial impact was mini-

mal. Any potential prejudice was curable; any possible error is not reversible.

The prosecutor's comments which were probably the most egregious and which will serve to indicate the nature of the remarks here urged as error occurred with reference to the defendant's theory of the case. During his closing argument, the prosecutor referred to the defendant's account of how he came into possession of the decedent's car as a "cock-and-bull story", and stated "that the defendant, to put it bluntly, he's lying to you".

This Court has repeatedly declined to find reversible error where the prosecutor argued that the defendant was lying and no objection to this language was made at trial. *People v Pacely,* 51 Mich App 67; 214 NW2d 561 (1974); *People v Couch,* 49 Mich App 69; 211 NW2d 250 (1973), *lv den,* 391 Mich 755 (1973); *People v Cowell,* 44 Mich App 623; 205 NW2d 600 (1973). While the prosecutor could have conveyed the underlying idea to the jury in more prosaic terms and hence avoided any semblance of impropriety, the language that he chose to employ did not exceed permissible limits of prosecutorial responsibility.

## VIII

One of the three persons in the park in Grand Rapids who were present when the defendant stated that he had killed a man and taken his car, presumably could not be located, and was not called as a witness by the prosecution. Arguing that this person, Gary Brown, also known as Tattoo Man, was a res gestae witness, defendant objects for the first time on appeal to the prosecution's failure to indorse and call this witness.

Defendant is unable to cite any authority for his

proposition that a person who hears a defendant admit committing a crime becomes a res gestae witness. In any event, the identity of the witness was well-known to the defendant long before trial but he did not move for the indorsement or production of the witness. Furthermore, the testimony of the witness would be merely cumulative in that two other persons in the park at that time did testify. Under these circumstances, failure to produce the witness was not reversible error. *People v Koehler,* 54 Mich App 624; 221 NW2d 398 (1974).

The two remaining issues raised by the defendant are inane, and merit no comment other than to point out that the theory of felony murder has no application to the present case.

Affirmed.