**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Appellant,<br><br>  v.<br><br>ALEJANDRO SAMUEL MEZA,<br><br>     Respondent. | No. 83797-4-I<br><br>DIVISION ONE<br><br>PUBLISHED OPINION |

HAZELRIGG, A.C.J. — The State of Washington appeals from an order granting a new trial based on the cumulative prejudice that resulted from pervasive prosecutorial misconduct. Because the trial court did not abuse its discretion, we affirm.

FACTS

On March 7, 2021, Alejandro Meza and Gene Peterson were involved in a verbal, and then physical, altercation on a bus in Everett. Meza accused Peterson of smoking drugs on the bus and told him to stop. The men, along with Peterson's associate, Howard Forbes, argued briefly and then Peterson struck Meza in the face. Meza began bleeding from the blow and became concerned about having a seizure based on his medical history. As they continued to scuffle, Peterson pulled Meza's hood over his head, obscuring his vision.

Meza testified that the fight escalated further when he saw and felt a hand reaching for his waist, where he was carrying a firearm and knives. Meza drew his firearm and fired two shots, one second apart, killing Peterson. The entire encounter was captured on video by a security camera on the bus. Meza made no pre-arrest statements to officers, but did make several statements after he was given Miranda[1] warnings, both on the scene and later at the police station pursuant to a recorded interview. He terminated the recorded interview after invoking his right to remain silent and to counsel at which point the officers ceased questioning.

The State initially charged Meza with murder in the second degree. The information was later amended to add an allegation that the intentional murder was committed with a deadly weapon, a separate firearm enhancement, and one misdemeanor count of carrying a concealed weapon without a license. The case proceeded to trial and Meza testified. In his cross-examination of Meza, the prosecutor stated, "I want to talk about some of the new information that previously hasn't been disclosed until Friday," a reference to the day during trial when Meza began to testify. Meza objected and argued this was a comment on his exercise of the right to remain silent and to counsel. The court sustained the objection and explained its reasoning, but denied Meza's subsequent request for a mistrial. In sustaining the defense objection, the following exchange between the court and the deputy prosecutor occurred:

> [THE COURT:] Well, you can point out the differences. That — I have no — I don't think that's objectionable. It's the form of what

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 694 (1966).

- 2 -

you asked. New information is highly prejudicial. And that's the problem.

It's not that you can't compare the statements he made on the stand or the statements he made to the officers. It's the way you're phrasing it that makes it prejudicial and makes it look like suddenly he's holding back. When he has the right to answer the questions when he's in front of the officers any way he wants to, and he can remain silent. You know this.

[DEPUTY PROSECUTOR]: I do.

THE COURT: So that's the problem.

(Emphasis added.) Despite this instruction from the court, the prosecutor made several similar statements during his closing argument about Meza's failure to incorporate the details provided in his trial testimony into his earlier statements to police. The prosecutor additionally misstated the burden of proof and characterized the shooting as an execution.

The jury found Meza not guilty of murder in the second degree, but convicted him of the lesser included offense, which had been provided to the jury over his objection, manslaughter in the first degree with a firearm enhancement. Meza moved for a new trial under CrR 7.5. He argued that the cumulative prejudice of the prosecutor's comment in cross-examination, in addition to the statements made during closing argument, necessitated a new trial. The court granted the motion, issuing findings of fact and conclusions of law along with its ruling.

The State timely appealed.

No. 83797-4-I/4

ANALYSIS

Under CrR 7.5(a)(2), if "it affirmatively appears that a substantial right of the defendant was materially affected" by "[m]isconduct of the prosecution or jury," the court "may grant a new trial." We review a decision on a motion for a new trial for abuse of discretion. State v. Burke, 163 Wn.2d 204, 210, 181 P.3d 1 (2008). A trial court abuses its discretion if its decision is based on "untenable grounds or for untenable reasons, such as a misunderstanding of the underlying law." Id. We review the trial court's "'rulings as to the law'" de novo. State v. Lupastean, 200 Wn.2d 26, 37, 513 P.3d 781 (2022) (internal quotation marks omitted) (quoting Robinson v. Safeway Stores, Inc., 113 Wn.2d 154, 158, 776 P.2d 676 (1989)). The court's findings of fact are reviewed for substantial evidence. State v. Wood, 19 Wn. App. 2d 743, 775, 498 P.3d 968 (2021).

Where a motion for a new trial is based on prosecutorial misconduct, "the trial court applies the same standard as an appellate court reviewing such claims." State v. McKenzie, 157 Wn.2d 44, 52, 134 P.3d 221 (2006). The court views the State's allegedly improper remarks "'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury'" to determine if the prosecutor's comments were improper and prejudiced the accused. Id. (quoting State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

A trial judge has "'broad discretion in granting motions for new trial.'" State v. Mohamed, 186 Wn.2d 235, 240-41, 375 P.3d 1068 (2016) (quoting State v. Williams, 96 Wn.2d 215, 221, 634 P.2d 868 (1981)). We afford even greater

- 4 -

deference to a court's decision to grant a new trial than a ruling to deny. State v. Lopez, 190 Wn.2d 104, 117, 410 P.3d 1117 (2018). This deferential standard is "based on 'the oft repeated observation that the trial judge, having seen and heard the proceedings, is in a better position to evaluate and adjudge than we can from a cold, printed record.'" State v. Perez-Valdez, 172 Wn.2d 808, 819, 265 P.3d 853 (2011) (internal quotation marks omitted) (quoting McKenzie, 157 Wn.2d at 52). Likewise, because it has the benefit of witnessing the proceedings live, "the trial court is in the best position to discern prejudice." State v. Garcia, 177 Wn. App. 769, 777, 313 P.3d 422 (2013). With these principles in mind, we turn to the merits of the State's appeal.

I.       Improper Comment on Exercise of Constitutional Right

A.       General Principles

An individual's exercise of their right to remain silent after receiving Miranda warnings may not "be used to impeach an explanation subsequently offered at trial." Doyle v. Ohio, 426 U.S. 610, 618, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976). This is by virtue of the fact that "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." Id. at 617. However, the rule "does not apply to cross-examination that merely inquires into prior inconsistent statements" as "[s]uch questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent." Anderson v. Charles, 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980). Under this Supreme Court precedent, "the State may question a defendant's failure to

incorporate the events related at trial into the statement given [to] police or it may challenge inconsistent assertions" if "a defendant waives the right to remain silent and makes a statement to police." State v. Belgarde, 110 Wn.2d 504, 511, 755 P.2d 174 (1988). Where a defendant makes a statement to police and then asserts something different at trial, the "'partial silence' . . . is not insolubly ambiguous, but 'strongly suggests a fabricated defense and the silence properly impeaches the later defense.'" Id. at 511-12 (quoting State v. Cosden, 18 Wn. App. 213, 221, 568 P.2d 802 (1977)).

In State v. Romero, Division Three of this court articulated a two-step analytical framework "for dealing with the problem of direct and indirect comments from State agents about a defendant's constitutional right of silence." 113 Wn. App. 779, 790, 54 P.3d 1255 (2002). Under Romero, a direct comment is a constitutional error. Id. In contrast, if a comment is indirect, "three questions should be considered before deciding whether the comment rises to constitutional proportions." Id.

> First, could the comment reasonably be considered purposeful, meaning responsive to the State's questioning, with even slight inferable prejudice to the defendant's claim of silence? Second, could the comment reasonably be considered unresponsive to a question posed by either examiner, but in the context of the defense, the volunteered comment can reasonably be considered as either (a) given for the purpose of attempting to prejudice the defense, or (b) resulting in the unintended effect of likely prejudice to the defense? Third, was the indirect comment exploited by the State during the course of the trial, including argument, in an apparent attempt to prejudice the defense offered by the defendant?

Id. at 790-91 (citations omitted). "Answering 'yes' to any of these three questions means the indirect comment is an error of constitutional proportions." Id. at 791.

- 6 -

No. 83797-4-I/7

B.       Parties' Dispute as to Applicable Case Law

The State first argues that the prosecutor's statements are distinguishable from cases where courts have held the State improperly commented on the accused's exercise of their right to silence.   It contends that several facts distinguish this case from previous ones: (1) Meza provided more than "limited statements" to police before invoking his right to remain silent and to counsel, (2) the prosecutor never directly stated that Meza ended his interview or refused to answer questions, and (3) the prosecutor did not imply that Meza's silence was evidence of guilt, but rather used the omissions to attack Meza's credibility. Because of this, the State alleges, the prosecutor's comments are more akin to Anderson,[2] Hatley,[3] Cosden,[4] and Young.[5]

In Anderson, the Court held that the State did not improperly comment on post-arrest silence because "[t]he quoted colloquy, taken as a whole, does 'not refe[r] to the [respondent's] exercise of his right to remain silent; rather [it asks] the [respondent] why, if [his trial testimony] were true, he didn't tell the officer that he stole the decedent's car from the tire store parking lot instead of telling him that he took it from the street.'"   447 U.S. at 408-09 (most alterations in original) (quoting People v. Charles, 58 Mich. App. 371, 381, 227 N.W.2d 348 (1975)). However, nothing in Anderson indicates the defendant ever invoked his right to silence or to counsel, and the colloquy focused on the factual differences between two contradictory statements, rather than omissions.  Id.

---

[2] 447 U.S. 404, 408, 100 S. Ct. 2180, 65 L. Ed. 2d 222 (1980).
[3] State v. Hatley, 41 Wn. App. 789, 706 P.2d 1083 (1985).
[4] State v. Cosden, 18 Wn. App. 213, 568 P.2d 802 (1977).
[5] State v. Young, 89 Wn.2d 613, 574 P.2d 1171 (1978).

- 7 -

In State v. Hatley, this court held that where a defendant "makes one or more statements involving the facts of the case, then he or she has not exercised the right to remain silent and is subject to the rules normally governing cross examination." 41 Wn. App. 789, 801, 706 P.2d 1083 (1985). However, Hatley is factually distinguishable because there is no indication that the defendant there elected to remain silent. Id. at 800. The court stated it was "noteworthy that Hatley gave no indication to [the detective] that he desired to exercise his right to remain silent, nor did he make any such claim at trial." Id. at 801.

In State v. Cosden, Division Two of this court held that the State properly impeached a defendant based on the "wholly inconsistent" statements he made to police and at trial. 18 Wn. App. at 220-21. Cosden is factually similar to the case before us in that the defendant made a statement to the police after he was provided Miranda warnings, but later invoked his right to remain silent. Id. at 220. Because Cosden made a statement to police, "there was not an unequivocal post-arrest assertion of the right to remain silent," and, rather, "his partial silence strongly suggests a fabricated defense and the silence properly impeaches the later defense." Id. at 220-21.

Finally, in State v. Young, our Supreme Court held a prosecutor properly argued "the failure of the defendant to disclaim responsibility" because he had "voluntarily waived his right to remain silent." 89 Wn.2d 613, 621, 574 P.2d 1171 (1978). The court quoted from an Ohio Supreme Court case, which stated in part, "'If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected by

- 8 -

No. 83797-4-I/9

Miranda or Doyle.'" Id. at 621 (quoting State v. Osborne, 50 Ohio St. 2d 211, 220, 364 N.E.2d 216 (1977)).

The cases the State relies on generally stand for the proposition that a defendant who makes any post-arrest statement to police has waived their right to remain silent and thus may be cross-examined on omissions later identified in the statement made to police. However, several cases contradict that broad premise.

Meza urges us to follow State v. Heller. 58 Wn. App. 414, 793 P.2d 461 (1990). In Heller, we held that "the State was entitled to cross-examine Heller regarding her inconsistent prior statements and 'raise unfavorable inferences from the defendant's failure to tell police at the time of her arrest crucial exculpatory information she later relates at trial.'" Id. at 418 (quoting State v. Gutierrez, 50 Wn. App. 583, 589, 749 P.2d 213 (1988)). However, the court also held that the prosecutor acted improperly when they asked Heller "whether she or her attorney ever went to the police or prosecutor after the original interrogations to tell them her story," as it "wrongly suggested to the jury that she or her attorney had an affirmative obligation to come forward with an explanation." Id. at 418-19.

State v. Silva also contradicts the authority offered by the State. See 119 Wn. App. 422, 430, 81 P.3d 889 (2003). There, the court held that there was not "an incomplete self-serving statement followed by inconsistent trial testimony," which distinguished Silva's case from other precedent. Id. Rather, "Silva answered innocuous identifications, then declined to incriminate himself." Id.

- 9 -

No. 83797-4-I/10

Similarly, in State v. Fuller, Division Two of this court analyzed a prosecutor's statements about a defendant's silence where the defendant "invoked his right to partial silence in not responding to some of [the officer's] questions or statements during the custodial interrogation. Thus, the State could not elicit testimony or comment on Fuller's partial silence to infer his guilt." 169 Wn. App. 797, 816, 282 P.3d 126 (2012).

C.      Prosecutor's Statements During Cross-Examination

During his cross-examination of Meza, the prosecutor stated, "I want to talk about some of the new information that previously hasn't been disclosed until Friday," referencing the first day Meza testified. In granting the defense objection to the State's comment, the judge explained to the prosecutor, "It's the way you're phrasing it that makes it prejudicial."

In briefing, the State focuses on its authority to impeach a defendant on inconsistent statements rather than the heart of the court's ruling: the phrasing of the prosecutor's question as an improper comment on Meza's exercise of his right to remain silent. Contrary to the State's contention, the prosecutor did not merely "compare[] the defendant's statements to police to his trial testimony;" he asserted, through the phrasing of his question, that Meza was disclosing "new information" at the time of trial. The court specifically explained that the prosecutor "use[d] that type of language to imply that he somehow is holding back when he has the right to hold back."

Here, the State could question Meza on the inconsistencies between his testimony and the statement he gave to police. However, the language chosen

- 10 -

by the prosecutor in doing so wrongly implied that Meza had an obligation "to come forward with an explanation" but, instead, was only providing this "new information" at trial. See Heller, 58 Wn. App. at 419. The court carefully described the reasons why this comment was improper and what the prosecutor needed to do to avoid violating the law. Again, the prosecutor stated his agreement to the court's framing of the issue:

> [THE COURT:] It's not that you can't compare the statements he made on the stand or the statements he made to the officers. <u>It's the way you're phrasing it that makes it prejudicial</u> and makes it look like suddenly he's holding back. When he has the right to answer the questions when he's in front of the officers any way he wants to, and he can remain silent.
> <u>You know this.</u>
>
> [DEPUTY PROSECUTOR]: <u>I do.</u>
>
> THE COURT: So that's the problem.

(Emphasis added.) The statement during cross-examination was an impermissible comment on Meza's invocation of his rights; the prosecutor was warned by the court and acknowledged that he understood.

### D. Prosecutor's Statements During Closing Argument

Despite the focused discussion with the court, the prosecutor repeated this improper argument in closing several times:

1. What did Mr. Meza leave out that came out on Friday and yesterday? Mr. Meza left out that he felt someone was reaching for his gun . . . And we don't hear that until six months later.

2. Isn't it of significant importance to tell the officers that you have had a focal seizure on scene in the back of a cop car, maybe we should hold off on this interview. Nope. We'll just do it on the day of testimony.

3.  Isn't it strange that he didn't tell those things immediately to officers?

4.  You heard from Mr. Meza that someone was reaching for his gun on his hip — no pockets, no jackets. His gun on his hip for the first time.

5.  [Meza] enjoys no presumption whatsoever as to his credibility. You decide that. That's your charge. That's your duty. It's your charge to decide whether it's too convenient to remember on the Friday of a jury trial that someone touched your hip. You decide whether it's credible to neglect to mention to officers that you've had a seizure in the back of a cop car. You decide whether it's reasonable to leave out exactly where the victim was reaching at any one time. And you will be able to listen to the interview to your heart's content. Tell me where he says exactly where he was reaching, and tell me where he mentions that it was actually on his person and not Mr. Peterson's. I would submit to you that the difference is glaring. How do you forget to mention that someone is reaching for your gun. And the answer is just that simple because it didn't happen.

6.  Ladies and gentlemen, I'll say it again this man may be presumed innocent. He is not presumed credible. And I would submit to you, you'll have no reason to think he is. You have no reason to think Mr. Meza was credible. Mr. Meza didn't even tell — remember, he's sitting in this chair, he gets punched in the face. He feels a metallic taste in his mouth. He thinks he's about to have a stroke — right? — or a seizure. That's why he thinks he's in fear of his life. Never mentioned to the officers. Ever. Never mentioned to the officers no mention to anybody until Friday.

Although the court had admonished the prosecutor and explained the specific basis for his ruling, and counsel for the State affirmatively stated that he understood the prejudicial impact of his phrasing, the prosecutor continued making improper arguments in the same vein as the statement that drew the objection. These statements implied, again and again throughout the State's closing, that Meza had a duty to supplement or correct his earlier statement to officers. The trial judge did not err in his conclusion that this constitutes an

improper comment on Meza's exercise of his constitutional right to remain silent and to counsel.

Critically, Meza's case is distinct from those now cited by the State because the supplemental details he provided at trial are not inconsistent with his statement given to police and are borne out by the security footage from the bus that the State introduced. For example, Meza testified at trial that he felt a hand reaching near his waist that he believed was Peterson's. The video footage of the interaction appeared to show that approximately five seconds before Meza fired the first shot, Forbes, who was travelling with Peterson, reached his hand in between Peterson and Meza "up and around the chest side." Feeling a hand near his weapon was a key piece of Meza's theory of self-defense and the video evidence substantiated that aspect of his testimony. Meza also testified that he was afraid he was about to have a seizure after Peterson hit him and that he believed he had experienced a focal seizure[6] in the back of the police car. Contrary to the State's implication that this was new information, Meza did explain to officers on the scene that he suffers from seizures, including focal seizures. This was not a different narrative, as in Anderson or even Young, but simply additional details consistent with the information provided to law enforcement close in time to the incident.

The State argued before this court that a prosecutor only makes an improper comment where the State specifically informs the jury that the accused

---

[6] Meza testified that, based on his history with seizures and understanding of different types and symptoms, one would not lose consciousness during a focal seizure.

- 13 -

No. 83797-4-I/14

has exercised their right to silence.[7]  This assertion is not supported by the law. No magic words are required to determine that the State has improperly commented on the accused's exercise of their right to silence.  Romero is clear that an indirect comment can rise to the level of constitutional error.  See 113 Wn. App. at 790.  Here, all three questions in Romero are answered "yes."[8]  See Id. at 790-91.  First, the comment during cross-examination could "reasonably [be] considered purposeful," as the prosecutor knew Meza had terminated the recorded interview when he invoked his right to silence.  This knowledge can be attributed to the prosecutor because, for example, Meza's recorded interview with police was played for the jury, but was expressly redacted so that it ended before his invocation of rights.  The prosecutor asserted to the court that the redactions were consistent with the court's rulings on motions in limine.  This knowledge was clearly present when the prosecutor began a question by stating, "I want to talk about some of the new information that previously hasn't been disclosed until Friday."  Second, as the trial court carefully explained to the prosecutor, this comment was likely to impair the defense because "the way you're phrasing it . . . makes it prejudicial and makes it look like suddenly he's holding back."  Third, under Romero, "the indirect comment [was] exploited by the State during the course of trial, including argument, in an apparent attempt to

---

[7] Wash. Court of Appeals oral argument, State v. Meza, No. 83797-4-I (Apr. 12, 2023) at 7 min., 26 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023041157/?eventID=2023041157.

[8] The three questions are: (1) Could the comment reasonably have been considered purposeful? (2) Could the comment be considered given for the purpose of prejudicing the defendant or unintentionally result in prejudice to the defendant? (3) Was the comment "exploited by the State during the course of trial, including argument, in an apparent attempt to prejudice the defense offered by the defendant?"  Romero, 113 Wn. App. at 790-91.

- 14 -

No. 83797-4-I/15

prejudice the defense offered by the defendant" as reflected in the prosecutor's repeated references in his closing argument to "new information," urging the jury to disbelieve Meza's self-defense claim. Id. at 791. Further, the State knew Meza had invoked his right to remain silent, and the only way to rebut the prosecutor's improper inference regarding that invocation would have been for Meza to disclose that he had in fact exercised his right to silence and to an attorney. See State v. Curtis, 110 Wn. App. 6, 14, 37 P.3d 1274 (2002). Under the Romero test, the prosecutor's comments here, though indirect, amount to constitutional error.

The trial court correctly interpreted and applied the law and therefore did not abuse its discretion.

II.     Misstatement of the Burden of Proof

The court's decision to grant a new trial also considered the prosecutor's misstatement of the law as to the burden of proof. The prosecutor asserted, "There is no benefit of the doubt, ladies and gentlemen, when it comes to the amount of force that you apply, right?" On appeal, the State properly concedes this argument was error. Throughout a criminal proceeding, the accused "is entitled to the benefit of a reasonable doubt" and it is improper for the State to argue otherwise. State v. Warren, 165 Wn.2d 17, 26-27, 195 P.3d 940 (2008). Where the accused raises a self-defense claim, "the prosecution bears the burden of proving beyond a reasonable doubt the absence of self-defense." State v. McCullum, 98 Wn.2d 484, 493, 656 P.2d 1064 (1983). Under the law of self-defense in the State of Washington, Meza is explicitly entitled to the benefit

- 15 -

of the doubt and the prosecutor's statement to the contrary was error. We accept the State's concession and agree that the trial court did not misapply the law in concluding that this inaccurate assertion was misconduct.

III.     Characterization of Shooting as "Execution"

The State next avers the trial court erred in finding the characterization of the shooting as an "execution" was improper. In closing argument, the prosecutor "has wide latitude to argue reasonable inferences from the evidence," but "must seek convictions based on only probative evidence and sound reason." State v. Thorgerson, 172 Wn.2d 438, 448, 258 P.3d 43 (2011); State v. Lucas-Vicente, 22 Wn. App. 2d 212, 224, 510 P.3d 1006 (2022). It is error for a prosecutor to "'mislead the jury by misstating the evidence.'" State v. Markovich, 19 Wn. App. 2d 157, 170, 492 P.3d 206 (2021) (quoting State v. Guizzotti, 60 Wn. App. 289, 296, 803 P.2d 808 (1991)). "Thus, a prosecutor must function within boundaries while zealously seeking justice" as they owe "a duty to defendants to see that their rights to a constitutionally fair trial are not violated." State v. Monday, 171 Wn.2d 667, 676, 257 P.3d 551 (2011).

Here, the State argues that the characterization of the shooting as an "execution" was a reasonable inference based on the evidence adduced at trial because Meza shot Peterson, Peterson fell to his knees while turning his back toward Meza, and Meza then fired a second shot. The prosecutor stated:

> Ladies and gentlemen, this man has been hit. He is turned away. He is on his way down to the ground. He has less than an hour to live. Mr. Meza executed him. Mr. Meza shot him in the back.
>     Mr. Meza shot him right on top of the shoulder through his lungs and through his liver. At that moment, there was no imminent

No. 83797-4-I/17

> threat. At that moment, there was no risk of severe pain, suffering,
> or death. Nothing was going to be happening to Mr. Meza at this
> point.
>       That's where it's murder. That's why it counts.

(Emphasis added.)

The State relies on two cases where courts have held a prosecutor's characterization of a death as an "execution" was not misconduct. First, in State v. Davis, our Supreme Court held a prosecutor's comment that the defendant "acted as the 'judge, jury and executioner of the victim'" was not misconduct because "[t]here is nothing in the argument to indicate the comment was intended to inflame the jury." 141 Wn.2d 798, 873, 10 P.3d 977 (2000). Next, in State v. Berkley, an unpublished opinion,[9] this court held a prosecutor's characterization of a shooting as an execution was not improper because it was based on a reasonable inference from the evidence presented.[10] The victim in Berkley was shot in the face while seated and buckled in his car; Berkley then waited several seconds before firing again, striking the victim in the head.[11] These facts "support[ed] a reasonable inference that if the first shot was intended to incapacitate [the victim], the only conceivable purpose for the second shot was to end [the victim's] life," and thus the characterization of the shooting as an execution was a permissible inference.[12]

---

[9] Under GR 14.1(a), "[u]npublished opinions of the Court of Appeals have no precedential value and are not binding on any court," though they "may be accorded such persuasive value as the court deems appropriate."
We discuss Berkley as one of the cases offered by the State in support of its argument and because it analyzes a similar allegation of an improper statement.
[10] No. 82588-7-I, slip op. at 16 (Wash. Ct. App. Sep. 6, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/825887.pdf.
[11] Id.
[12] Id.

- 17 -

Again, courts review allegedly improper statements in the context of the entire trial. In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). Important context to the prosecutor's comment here is the State's consistent use during trial of an altered version of the video exhibit that showed the shooting. While the prosecution repeatedly played an artificially slowed version of the footage, and questioned Meza about his thoughts during the protracted time between the shots, the unaltered footage reflects that only one second elapsed between the first and second shot. This emphasis of a distorted version of the evidence used during cross-examination was used to suggest to the jury that Meza had sufficient time to realize that any threat he originally perceived had dissipated and that the second shot was unnecessary to protect himself, therefore, it could only have been intended to kill Peterson.

Another fact critical to the overall analysis of this issue is that this shooting took place in the context of a physical altercation initiated by Peterson where both men were active participants; this is vastly distinct from Davis and Berkley where the victims were in a passive position compared to the accused. See Davis, 141 Wn.2d at 814-15, Berkley, slip op. at 16. In fact, the evidence here establishes that Meza believed Peterson was smoking drugs on the public bus and verbally confronted him about that conduct. Toxicology evidence introduced at trial supports Meza's belief in this regard as the medical examiner, Robert Johnston, testified that, at the time of his death, Peterson had alcohol, methamphetamine, heroin, marijuana, and fentanyl in his system. Johnston testified that the levels of methamphetamine and fentanyl were high, in fact, he

noted that the level of methamphetamine alone may have been "fatal in some people." Johnston concluded that at the time of the fight, Peterson "wouldn't be in a sober state of mind." Through that lens of substance use and upset by Meza's callout, Peterson continued the verbal dispute with him, and Forbes joined in, making threats referencing Peterson's dangerousness. Peterson not only initiated the physical fight with Meza, bloodying Meza's face and causing him concern over a seizure being triggered, he pulled the hood of Meza's jacket over his head, obscuring his vision, and likely increased the fear of harm Meza experienced. All of this turmoil preceded the point in the incident when Meza felt a hand near his weapons, a firearm and knives. The unaltered evidence presented at trial does not support a reasonable inference that Meza "executed" Peterson. Thus, the court did not abuse its discretion in concluding the comment was improper and prejudicial.

IV.     Cumulative Error

The court ultimately concluded that the cumulative impact of the prosecutor's misconduct throughout the proceedings was sufficiently prejudicial that no remedy short of a new trial could provide appropriate relief. In briefing, the State argued the court abused its discretion in applying the cumulative error doctrine because the evidence against Meza was overwhelming. However, at oral argument, the State conceded that if this court agreed the prosecutor

improperly commented on Meza's exercise of his right to silence, there is no abuse of discretion as to application of the cumulative error doctrine.[13]

"The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal." In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012). The test "is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial." In re Pers. Restraint of Cross, 180 Wn.2d 664, 690, 327 P.3d 660 (2014), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). Where "the evidence is overwhelming against a defendant," cumulative error will not require reversal. Id. at 691.

Here, the trial court determined that "[t]he prosecutor repeatedly sought to tarnish the defendant's exercise of his constitutional rights," and that there was "no credible argument" that the statements did not "have an improper effect in swaying the jury." The prosecutor further made two additional, independently improper, assertions in closing. While a curative instruction might have neutralized each instance of misconduct in isolation, the trial court did not err in concluding that the cumulative effect of these arguments warranted a new trial. This is particularly true because the improper arguments focused on the defendant's credibility as to his self-defense claim, which was the heart of his theory of the case. The purpose of the prosecutor's comment on Meza's exercise of his right to silence was to undercut his credibility; the statement that

---

[13] Wash. Court of Appeals oral argument, supra, at 20 min., 58 sec.

Meza was not entitled to "the benefit of the doubt" was likewise used to impugn Meza's credibility as to his fear and use of force with regard to self-defense. Finally, the characterization of the shooting as an "execution" was also offered as a means to argue that the jury should not believe Meza's testimony that he acted in self-defense. The court was in the best position to observe the tenor and tone of these statements as they were made and, more critically, to discern the impact that the prosecutor's improper arguments had on the jury. Case law is clear that it is precisely for these reasons that the trial court is afforded a high degree of deference when it grants a motion for a new trial; it did not abuse its discretion in concluding that the proper remedy here was a new trial.

The evidence against Meza was not so overwhelming that it negated the cumulative error of the prosecutorial misconduct. The jury unanimously found Meza not guilty of murder in the second degree, as charged by the State, even when presented with video evidence of the shooting. Instead, the jury found him guilty of manslaughter in the first degree; meaning, based on the jury instructions as to the original charge and the lesser included offense, it found that Meza acted with recklessness rather than intent to cause death. Turning to the evidence presented at trial, medical examiner Johnston testified that the level of methamphetamine in Peterson's body at the time of his death was "definitely high." Johnston explained that, "Methamphetamine is associated with, yeah, violent and irrational behavior, and it's within the level there they've reported." Forbes, Peterson's associate who was present on the bus, testified that Peterson

had a knife in the backpack in his possession at the time of the altercation.[14]

Forbes provided the only other eyewitness testimony of the altercation and

shooting; he largely could not remember or had not seen the events leading up to

the shooting. Meza also testified at trial. He stated that Peterson "threatened to

beat me and put me to sleep," and that Forbes told him that Peterson was "not

someone I want to mess with." Meza further testified that Peterson struck him in

the head "hard enough to make me bleed and for my head to go back." He

described feeling "[n]ot safe" because he "couldn't really see anything" after

Peterson pulled Meza's hood up over his head. Meza stated he thought he saw

and felt someone reaching across his waist, toward where he carried his

weapons, and presumed it to be Peterson. The footage of the incident appears

to show that approximately five seconds before Meza fired the first shot, it was

actually Forbes who reached between the men, "up and around the chest side" of

Meza. Meza testified he "was scared for [his] life," drew his weapon and fired

two shots, one second apart.

Based on the evidence presented at trial, there was not "overwhelming

evidence" that Meza committed manslaughter in the first degree and, as such,

the trial judge correctly applied the cumulative error doctrine. A jury could have

found, based on the jury instruction for self-defense, that Meza reasonably

believed Peterson intended to "inflict death or great personal bodily injury" based

on the perceived drug use on the public bus (later confirmed by toxicology

results), verbal threats, physical altercation, obscuring of Meza's vision, and

---

[14] Forbes testified that the backpack and knife belonged to him but admitted that at the time of the altercation, they were in Peterson's possession.

apparent reach across Meza's body toward the area that he was carrying weapons. It could have also found, pursuant to the jury instruction on self-defense, that Meza reasonably believed Peterson would cause such harm, and that Meza employed the same force "as a reasonably prudent person would use under the same or similar conditions," particularly given the speed at which the altercation took place. The evidence presented does not preclude application of the cumulative error doctrine.

Again, "the trial court is in the best position to discern prejudice." Garcia, 177 Wn. App. at 777. The trial judge observed the proceedings as a whole, as it played out in real time; he had the benefit of observing the argument of the parties, the evidence presented, and the impact of the prosecutor's misconduct on the jury. It was the trial judge who sat in the best position to determine the impact of the misconduct and to select the appropriate remedy; for these reasons this decision is appropriately shown great deference. The court did not abuse its broad discretion and, accordingly, we affirm.

_____
Hazelrigg, A.C.J.

WE CONCUR:

_____       _____
Smith, C.J.                            Dwyer, J.

- 23 -