[No. 44919. En Banc. February 2, 1978.]

THE STATE OF WASHINGTON, *Respondent,* v. RICKY ANTHONY YOUNG, *Appellant.*

*Sid Wurzburg,* for appellant.

*C. J. Rabideau, Prosecuting Attorney,* for respondent.

BRACHTENBACH, J.—Superior Court Judge James J. Lawless was killed when a pipe bomb exploded in his chambers. Defendant was convicted of first–degree murder for that death. He appeals. We affirm.

Investigation revealed that the pipe bomb had been mailed in a package from Kennewick, Washington, to Judge Lawless at the courthouse in Benton County, one of two counties in the judicial district in which Judge Lawless served. A court reporter hand carried the package from Prosser to Pasco and handed it to Judge Lawless in his chambers. Seconds after the reporter left, a loud explosion occurred. Judge Lawless' death was almost instantaneous, caused primarily by a metal fragment which pierced his heart.

The chamber area was sealed off immediately. A cooperative investigation was undertaken by the Franklin County sheriff's office, the Pasco city police, United States Postal Service inspectors and the Alcohol, Tobacco and Firearms Bureau of the United States Treasury Department. An officer with experience and expertise in bombings led the investigative team.

A grid work pattern was set up in the judge's chambers. Objects within the grid were gathered, photographed and packaged.

The lead investigator, senior chemist of the United States Postal Service with experience in investigating more than 50 bomb incidents, took the gathered materials to the service's crime laboratory in Washington, D.C. After several weeks' work, he was able to reconstruct the bomb and part of the wrapping, identify the powder and the triggering

device and partially reconstruct the letter which was inside the wrapping but outside the container holding the bomb.

The service's chief fingerprint inspector, a man with 25 years' experience in fingerprint identification, examined these papers for latent fingerprints. Two prints were found on the letter which was identified as having been inside the mailing wrapper. These latent prints were compared with 100 to 150 inked prints of various suspects, including the defendant. The chief inspector testified that one of the latent prints on the letter was identical to the defendant's right thumb print. The other print did not match any against which comparison was made.

The fingerprints were then inspected in a totally independent analysis by another service expert, a person with more than 18 years' experience in print indentification. He testified that the one latent print was identical to the defendant's right thumb print.

The State's evidence showed that the defendant was a stranger to neither the criminal justice system nor Judge Lawless. In 1972, Judge Lawless had sentenced defendant, who pleaded guilty to a charge of second–degree burglary, during which act defendant had fled but had been shot by the arresting officer. Judge Lawless suspended defendant's sentence for the burglary under rather unusual conditions, stating that he was inclined to send defendant to an institution as recommended by the prosecutor, but instead was imposing a 1–year county jail sentence. Defendant was also ordered to neither contact nor receive contact from, other than by letter, a 16–year–old girl whom he subsequently married. Details of this sentencing hearing were presented to the jury in the instant case as obviously bearing on motive for the bombing.

A few weeks before the bombing, defendant was charged with two separate felonies. A revocation of the suspended sentencing was set for preliminary hearing, which normally would be held before the presiding judge unless referred to the sentencing judge. In this case, the presiding judge and the sentencing judge were the same, Judge Lawless. When

defendant inquired of his probation officer who would hear the matter, he was told Judge Lawless. He stated he did not think he could get a "fair shake" from Judge Lawless. Affidavits of prejudice were filed against Judge Lawless in the other felony charges pending against defendant.

The bombing death occurred on June 3, 1974. On August 6, 1974, defendant was arrested on federal charges of mailing a nonmailable explosive in violation of 18 U.S.C. § 1716, a potential capital offense. On August 7, the state murder charge was filed and served on defendant while in federal custody. Defendant was arraigned on the state charge on September 11, 1974. A motion for change of venue was granted and defendant went to trial in Spokane County on December 2, 1974; the jury trial was presided over by Judge William Williams. A mistrial resulted when the jury was unable to agree. In July 1975, a retrial resulted in defendant's conviction.

As his first assignment of error, defendant claims he was denied a speedy trial as required by CrR 3.3. Whether we start with the date of arrest, filing, or the date of arraignment, defendant was not tried within 60 days. Are there time periods which must be excluded? We conclude that because CrR 3.3(d)(2) excludes from the computation of time "preliminary proceedings and trial on another charge", defendant was not denied a speedy trial.

Defendant was charged with three state felonies but held in physical custody by federal authorities. In fact, the county prosecutor had to obtain a writ of habeas corpus ad prosecudendum to have defendant present at his arraignment on the murder charge. One of the three state felonies pending at defendant's arrest was a 2-count arson charge. Venue was changed to Pierce County at defendant's request. He was transferred from federal custody in Yakima to federal custody in Tacoma for trial, which resulted in a conviction. Judgment was entered on November 14, 1974, and affirmed in *State v. Young*, 87 Wn.2d 129, 550 P.2d 1 (1976).

Trial on the federal charge was set for the week of December 17, 1974. Trial of the instant case was set for December 2, 1974. The United States then agreed to dismiss without prejudice and placed defendant in state custody for trial.

Defendant was in federal custody virtually the whole time from arrest to trial on this charge.

We agree with the rationale of *State v. Chaney,* 17 Wn. App. 258, 562 P.2d 259 (1977), that a defendant in custody of federal authorities pursuant to federal process is involved in preliminary proceedings in trial on another charge until the federal matter is concluded or the defendant is released to state custody. There was no denial of a speedy trial.

The second assignment of error challenges the sufficiency of evidence in the first trial. Such challenge requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. *State v. Thompson,* 88 Wn.2d 518, 564 P.2d 315 (1977). Whether there is evidence legally sufficient to go to the jury is a question of law, but when there is substantial evidence, and when that evidence is conflicting or is such that reasonable minds may draw different conclusions therefrom, the question is for the jury. *State v. Thompson, supra; State v. Reynolds,* 51 Wn.2d 830, 322 P.2d 356 (1958).

Second, defendant argues that the presence of his fingerprint on the letter inside the mailing wrapper of the bomb was insufficient by itself to carry the state's case to the jury. He relies on *State v. Sewell,* 49 Wn.2d 244, 299 P.2d 570 (1956). This disregards other evidence which cumulatively made a jury issue; there is direct evidence of motive and other incriminating facts and admissions which are detailed later in the discussion of *Miranda* warnings.

The *Sewell* case is distinguishable. In that case the State proved that someone had entered certain premises and that defendant's fingerprint was on the rear door. The applicable statute required entry as an essential element of the

crime. There was no proof, direct or circumstantial, that the defendant had entered. Here defendant's print was found on a letter taped to the package containing the bomb, under which tape were specks of the explosive powder. There was sufficient evidence to go to the jury.

The third assignment of error involves an allegedly deficient statement of rights given pursuant to *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966). Defendant was arrested by two postal inspectors on the federal charge. He had earlier been one of a number of people contacted by one of the inspectors for a handwriting sample, but after consulting his attorney had refused to give it. When approached prior to the actual arrest he stated that he would "give you the handwriting." He was informed that he was under arrest and was given a statement of his *Miranda* rights. Those rights were repeated when he was placed in a vehicle for transportation to the federal courthouse in Yakima. Defendant stated that he understood his rights.

During the 2–hour ride to Yakima, defendant was silent much of the time, but did make several damaging comments and asked several inculpatory questions, all of which were testified to by the inspectors. He asked the reason for his arrest and was told that his print was found in the bomb. He asked why it took so long to find the print. He stated that he understood there was writing on the bomb package, but that it wasn't his, it was that of someone else in Prosser. He inquired whether he would be proved innocent if a bomb exploded while he was in jail.

A fair summary of the inspectors' testimony is that they were not interrogating the defendant; rather defendant made spontaneous statements or asked questions.

The inspectors intended to question defendant at the federal courthouse in Yakima and were in the process of preparing a written waiver of his rights when they were summoned to a probable cause hearing before the local federal magistrate. As defendant was being escorted from the federal building he shouted to someone, later identified

as his wife, "They found my print in the bomb." Upon arrival at the magistrate's hearing, the defendant said that he would talk to the inspectors later; after consulting his attorney, he declined to do so.

The *Miranda* issue is the completeness of the statement of rights. During a CrR 3.5 hearing at the first trial, the postal inspectors testified as to the content of the statement of rights given defendant. It did not include a right to appointed counsel if defendant could not afford one. The court immediately recalled the witnesses, one at a time, asking each to repeat the statement of rights given defendant. Each stated a proper *Miranda* warning, indicating that such was the statement made to defendant.

The court concluded that a proper statement of rights had been given and allowed the inspectors to testify. At the second trial, the court again concluded that full *Miranda* statements in fact were given. We will not disturb that finding.

Defendant contends that even if the warnings were adequate, he did not waive his right to remain silent. The inspectors testified that defendant said he understood his rights; he did remain silent during much of the trip; he refused to name anyone else involved in the bombing; he initiated several of the topics discussed. Waiver can be established without an express waiver stated or signed. *State v. Blanchey*, 75 Wn.2d 926, 933, 454 P.2d 841 (1969). Waiver was established.

Fourth, defendant attacks remarks of the prosecutor in closing argument at the second trial. He argued, "Now did you hear in any of the testimony of these two men [referring to the arresting postal inspectors]—think about this—did you hear anyone, in their entire testimony, say that the defendant denied that he mailed the bomb or had anything to do with the construction of it? Now, what is your reaction?" Defendant objected, was overruled, but did not move for a mistrial.

Defendant relies principally upon *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976). That case

is not in point. The *Doyle* defendant chose to exercise his right to remain silent. When defendant testified, he was cross-examined as to why he did not tell his trial version of the facts to the police. The court held that this examination was an impermissible impingement of and comment on his right of silence. In the instant case, the defendant chose to not remain silent. The prosecutor was entitled to argue the failure of the defendant to disclaim responsibility *after* he voluntarily waived his right to remain silent and when his questions and comments showed knowledge of the crime. There was no error.

Other courts draw this same distinction. For example, in *State v. Osborne,* 50 Ohio St. 2d 211, 364 N.E.2d 216 (1977), the Ohio Supreme Court held that *Doyle* was not applicable when defendant did not remain silent and was cross-examined as to what he had not told officers. The court said at page 216:

> If a defendant voluntarily offers information to police, his toying with the authorities by allegedly telling only part of his story is certainly not protected by *Miranda* or *Doyle.*

> [T]here is no indication of any "silence" of appellant in this conversation, or that any "silence" resulted from reliance upon *Miranda* warnings.

In accord are *Phillips v. State,* 238 Ga. 632, 235 S.E.2d 12 (1977), and *State v. Olguin,* 88 N.M. 511, 542 P.2d 1201 (1975). There was no error.

■ Fifth, defendant assigns error to the refusal of the court to admit polygraph examinations, one of the defendant and one of another person who was under investigation in connection with the bombing. The general rule is clear— such tests are not admissible absent stipulation. *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1971); *State v. Young,* 87 Wn.2d 129, 550 P.2d 1 (1976). There was no proof here to meet the standard suggested in *Woo* and *Young* which we indicated would be a condition precedent to even considering whether we should reexamine the rule.

Defendant contends that the principles of *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963), and *Chambers v. Mississippi,* 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), mandate admission. Those cases stand for the proposition that the prosecution cannot conceal exculpatory evidence. Results of the tests were revealed to the defense in this case. Those two cases do not command admission of polygraph tests.

Defendant also relies on *United States v. Hart,* 344 F. Supp. 522 (E.D.N.Y. 1971). In that case the government had given its principal witness a polygraph test which indicated that the witness was lying. The government did not disclose the fact of the test or its result to the defendant, yet attempted to use the witness at trial. The court simply ordered that on retrial the government should be prepared to demonstrate its experience with polygraph tests, the record of the particular testers and the basis for subsequent doubts about the validity of polygraph tests and other relevant material concerning the tests. The test results in this case at best are inconclusive and in one case the report indicated that the operator had erroneously stated to defendant certain facts which could affect the test's outcome. *Hart* does not command the admission of these particular tests.

Defendant also relies upon *State v. Christopher,* 134 N.J. Super. 263, 339 A.2d 239 (1975). That decision was reversed at 373 A.2d 705 (1977). Finally, *State v. Dorsey,* 88 N.M. 184, 539 P.2d 204 (1975), where the court allowed admission is distinguishable. That court had previously laid down guidelines for admission of polygraph tests, including:

> [1] When the court has evidence of the qualifications of the polygraph operator to establish his expertise; [2] Testimony to establish the reliability of the testing procedure employed as approved by the authorities in the field; and [3] The validity of the tests made on the subject.

*State v. Dorsey, supra* at 185. In *Dorsey,* the parties stipulated that those conditions were met and they were not

before the court. No such foundation was laid in this case. All *Dorsey* held was that under the circumstances it would no longer require stipulation for admission. This is not the case for us to consider such a change. There was no error.

The sixth assignment deals with the testimony of David McKinney. McKinney testified that he and defendant were cellmates in the county jail. He testified to two conversations with defendant. His testimony is footnoted.[1] Clearly, it was an admission of guilt by defendant, if believed.

McKinney's testimony came about as follows: He had two state felony charges and a federal bank robbery charge pending against him. He mentioned to a federal marshal that he pitied defendant for all the time he was going to get for what he had done. The marshal mentioned the conversation to McKinney's attorney who was defending him on the bank robbery charges. That lawyer advised McKinney that it might help him to tell the authorities what he knew about defendant. Subsequently, postal inspectors took two written, sworn statements from McKinney but only after advising him of his rights and obtaining a written waiver of those rights. Incidentally, McKinney had substantial experience with the criminal process, having been convicted of

---

[1] After the witness identified the defendant and stated that they had a discussion, the following was the testimony:

"Q. Now what was this discussion concerning, sir? A. Well, I made a statement about all the time I'd get if I robbed a bank and he says, if you think you've got a lot of time you ought to get the time I'm going to get for killing the judge and I said, are you telling me that you killed this judge, and he said yeah. Q. Did he indicate when he—how he did this? A. Yeah, he said it took three weeks to prepare some bomb—said took us three weeks to prepare a bomb. Q. Took us. Did he say who us was? A. No, sir. Q. Did you ask him who the other person was? A. No. Q. All right. Well, did he indicate to you how this bomb was delivered to the judge? A. Yeah. He said that he mailed the package one morning and then went fishing. Q. Did you discuss it in any other depth with him? A. No. Q. Now, later on, in the month of March of 1975, did you have occasion to be in a jail cell with him at that time wherein you discussed why he did this? A. Yeah. He—I—that was when I was there after the bank robbery I pulled and he said that he did it because of the judge ordered him to stay away from his old lady for so long and he thought it was a pretty rank deal . . . Q. Did he mention the name of the judge? A. Yeah. Judge Lawless."

car theft, forgery, grand larceny, burglary and bank robbery, plus juvenile offenses.

After giving the written statements, which he later testified were truthful and given freely, McKinney became reluctant to testify. He had been transferred from a county jail to the Shelton institution. His life was threatened by other inmates for being a "snitch." He was subpoenaed by the State to testify at defendant's second trial.

It was undisputed that the McKinney–defendant conversation was not suggested or initiated in any manner by law enforcement personnel, but came to light only after McKinney's voluntary comment to the marshal and the subsequent advice of his attorney to cooperate with the authorities. At the CrR 3.5 hearing on the admissibility of defendant's statements to the postal inspectors, defendant insisted upon pretrial examination of McKinney. He contended that CrR 3.5(a) required a hearing as to the admissibility of McKinney's testimony. That rule provides:

**(a) Requirement for and Time of Hearing.** When a statement of the accused is to be offered in evidence, the judge at the time of the omnibus hearing shall hold or set the time for a hearing, if not previously held, for the purpose of determining whether the statement is admissible. A court reporter or a court approved electronic recording device shall record the evidence adduced at this hearing.

The court had doubt as to the applicability of the rule to testimony of a third person, but out of an abundance of caution included it within the hearing. The court held the testimony admissible. We do not comment on the applicability of the rule to such testimony as the issue is not raised.

Defendant's contention is that McKinney's testimony was tainted by prosecutorial misconduct and should not have been admitted. Prior to trial McKinney was interviewed by the Franklin County sheriff. McKinney said he didn't want to testify and he could plead the "Fifth." He testified that the sheriff told him "Yeah he told me I

couldn't plead the Fifth because there wasn't discriminating [*sic*] crimes against myself." Then the sheriff told him that there was a possibility of being held in contempt for not testifying, but that he should get a lawyer. Defendant's counsel also told McKinney to get a lawyer.

Defendant argues that McKinney in fact did have a right to a Fifth Amendment privilege, his tenuous theory being that McKinney was subject to a possible perjury charge if he testified differently from his sworn written statement. He then claims that the sheriff was the prosecutor's agent in giving this claimed erroneous advice; ergo, the prosecutor was guilty of misconduct. He also faults the trial court for not appointing counsel for McKinney.

First, while defendant asserts that the prosecutor was present when McKinney and the sheriff talked, he does not cite any place in the record where that occurred and we have found none. Second, he cites no authority for the proposition that the sheriff is an agent of the prosecutor. The point falls within our rule that

> Where no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none. Courts ordinarily will not give consideration to such errors unless it is apparent without further research that the assignments of error presented are well taken.

*DeHeer v. Seattle Post–Intelligencer,* 60 Wn.2d 122, 126, 372 P.2d 193 (1962). The assignment is not well taken. Third, the court indicated its willingness to appoint counsel for the witness if he so desired. McKinney made no such request. There was no error.

Seventh, defendant assigns error to exclusion of certain letters. Eleven days after defendant's arrest, two newspapers and a television station received letters, dated 7 days after defendant's arrest. The letters were entitled "The People's Army—An Official Communique" and began: "This communique is issued in response to the recent arrest

of one Ricky A. Young in connection with the June 3 assassination of James J. Lawless, which was in fact executed by elements of the People's Army." They stated that the assassination was "a purely military act of class struggle." The letters were mainly of a Marxist political nature. They also contained an addendum accurately describing the components of the bomb.

Defendant asserts that the letters were a declaration against penal interest and an exception to the hearsay rule. He contends they were supportive of the defendant's theory that someone else manufactured and mailed the bomb.

The majority does not allow admission of third party declarations of guilt as an exception to the hearsay rule. *See, e.g., Pitts v. State,* 307 So. 2d 473 (Fla. Dist. Ct. App. 1975), *cert. dismissed,* 423 U.S. 918, 46 L. Ed. 2d 273, 96 S. Ct. 302 (1975); *People v. Craven,* 54 Ill. 2d 419, 299 N.E.2d 1 (1973); *Commonwealth v. Arsenault,* 361 Mass. 287, 280 N.E.2d 129 (1972); *State v. Anderson,* 10 Ore. App. 34, 497 P.2d 1218 (1972). *Contra, People v. Spriggs,* 60 Cal. 2d 868, 389 P.2d 377, 36 Cal. Rptr. 841 (1964). This principle is true even as to actual confessions by identifiable persons.

Defendant urges that a change in the rule is mandated by *Chambers v. Mississippi,* 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973). *Chambers* does not go that far. The opinion is carefully limited to the facts and circumstances of that case. In *Chambers,* a third party confessed the crime to three different persons, including a sworn confession. He was identified as being at the scene of the crime, he owned the same type weapon as was used in the crime, which he apparently disposed of afterwards, he was present in the courtroom and under oath. The court held that due process required admission of the third person's out–of–court confessions.

■ Our Court of Appeals has construed *Chambers* to generate an exception to the general rule as follows:

The minimal evidentiary criteria which must be met before any such declaration can be considered as rising to

constitutional stature are these: (1) the declarant's testimony is otherwise unavailable; (2) the declaration is an admission of an unlawful act; (3) the declaration is inherently inconsistent with the guilt of the accused; and (4) there are such corroborating facts and circumstances surrounding the making of the declaration as to clearly indicate that it has a high probability of trustworthiness.

(Citations omitted.) *State v. Gardner*, 13 Wn. App. 194, 198–99, 534 P.2d 140 (1975).

We agree with Judge Andersen's formulation of the rule in *Gardner*. However, defendant does not meet those criteria. All defendant offered to prove was that some unknown person or persons composed and mailed the letters.

There was no identifiable declarant. There were no such corroborating facts and circumstances surrounding the making of the declaration, anonymous as it was, as to clearly indicate that it had a high probability of trustworthiness. In any event, the declaration was not inherently inconsistent with defendant's guilt. The defendant's fingerprint, his statements to the postal inspectors, his statements to witness McKinney all implicated him in the crime. The state's own evidence showed that others were suspected of being involved in the bombing.

If anonymous confessions from an organization never shown to even exist were allowed to exculpate a defendant, the floodgates would be open and all semblance of trustworthiness of evidence would disappear.

The eighth assignment raises an issue similar to the one just discussed. The defense attorney proposed calling the defendant's wife to testify that on the day of the bombing, she and defendant visited one Brent Pursell who stated something to the effect of "What do you think about the bomb I sent to Lawless."

Defendant again fails to meet the tests of *State v. Gardner, supra*. There was no showing that the declarant, Pursell, was otherwise unavailable. In fact the defense attorney knew his whereabouts. Defendant had asked the prosecutor

to subpoena Pursell, the prosecutor declined. The defendant moved for an order directing Pursell to appear. The court simply told defense counsel to subpoena Pursell and that it was not the court's function to direct witnesses to appear if no effort to subpoena had been made.

Defendant speculates that if Pursell had been subpoenaed he would have denied the statement and therefore he was unavailable. Such conjecture is hardly the unavailability contemplated by the narrowly drawn exception set forth in *Gardner.*

In addition, defendant failed to offer any proof of compliance with the fourth rule set forth in *State v. Gardner, supra.* A 1-sentence statement from the defendant's wife does not clearly indicate a high probability of trustworthiness.

Ninth, error is alleged in restricting the cross-examination of a witness. McKinney had testified as to defendant's admission to him that he had made and mailed the bomb. The defendant called a witness, Harter, who stated that McKinney's reputation for veracity was bad. In rebuttal, the State called a police officer who testified that Harter's reputation for veracity was bad. The defendant, on cross, tried to establish that the police officer also knew McKinney's reputation to be bad. The court sustained an objection that the question was beyond the scope of direct. The court told defense counsel that he could call, within reason, as many witnesses on reputation as he wanted. In fact, even after exceptions to the instructions were completed, the court allowed the defendant to reopen, yet he failed to call the officer as his own witness.

▮ The scope of cross-examination is within the discretion of the trial court. There must be a manifest abuse before we will disturb the trial court's ruling. *Smith v. Seibly,* 72 Wn.2d 16, 19, 431 P.2d 719 (1967). Patently there was no abuse here.

Tenth, defendant assigns error to the court's refusal to allow him to depose the jurors after the verdict, the motion being made about 2 weeks after the verdict was rendered.

Defense counsel's affidavit in support of his motion stated that his purpose was "to establish the exact basis for the jury's verdict and to determine if there was indeed misconduct by the jury in its deliberations in consideration of this case." The defense attorney submitted his own affidavit that he had discussed the case with nine of the jurors, that while they talked freely, they refused to give written affidavits. Apparently in their deliberations they discussed the fact that defendant had failed to present any character witnesses or psychological testimony. The affiant concluded that one item of testimony had been used "substantively" rather than for impeachment.

The cases relied upon are incontestably distinguishable. For example, and typical of the cases cited, is *Halvorson v. Anderson,* 82 Wn.2d 746, 513 P.2d 827 (1973). In that case a juror placed "facts" before the jury which were not in evidence. That is quite different from a jury's evaluation of what was proved and what was not proved. The facts in this case do not support any juror misconduct.

Defendant's attorney filed a supplemental affidavit alleging that one of the jurors had a preconceived belief that defendant was guilty which belief was not disclosed in voir dire. This information came from an unnamed person who had conversed with the juror allegedly prior to trial. The court was sufficiently concerned that it wrote counsel asking for the name and address of both the unnamed informant and the juror. Defense counsel informed the court that the informant was a relative of his by marriage and named the juror. Counsel did nothing more so the court took it upon itself to bring the juror in for examination. The juror, who had been foreman, was examined, under oath, by defense counsel and the court. He denied any preconceived belief of guilt. The only conversation about guilt occurred after the verdict was rendered and was only to the effect that he did not see how the first jury, if it had the same evidence as the second jury, could not have found the defendant guilty. The court concluded that there was no

misconduct. Defendant, in the examination of the juror, did not pursue any of his earlier allegations of misconduct.

■ Whether jurors are guilty of misconduct is a factual question; the trial court's finding will not be disturbed except for an abuse of discretion clearly shown. *Gaunt v. Alaska S.S. Co.*, 57 Wn.2d 847, 360 P.2d 354 (1961). The court considered the allegations to be serious, provided most of the impetus to inquire and concluded that there was no error. Not only was there no abuse of discretion, it is apparent there was a wise exercise of discretion.

■ The eleventh assignment raises an issue as to the correctness of giving an aiding and abetting instruction. Defendant contends that he was not charged as an aider and abettor and that the evidence was insufficient to sustain the instruction. There was direct and circumstantial evidence of defendant's participation in either or both the manufacture and mailing of the bomb. As to the legal question, it was answered fully in *State v. Carothers*, 84 Wn.2d 256, 260, 525 P.2d 731 (1974):

> The law is settled in this jurisdiction that a verdict may be sustained upon evidence that the defendant participated in the commission of the crime charged, as an aider or abettor, even though he was not expressly accused of aiding and abetting and even though he was the only person charged in the information.

(Citations omitted.)

■ Finally, the twelfth error alleges that the cumulative effect of the conduct of the prosecutor and errors by the court denied defendant a fair trial. Defendant refers to all assignments previously discussed, none of which were held to be meritorious, and to only two other matters. First, the court supposedly erred in allowing impeachment of a defense witness by testimony of a prior inconsistent statement. The witness had denied that he had told the postal inspectors that the defendant gave the impression that he "sure didn't like Judge Lawless." In rebuttal two postal inspectors testified that the witness in fact had made the denied statement. Upon request of the defendant, the court

precisely instructed the jury that the evidence was for impeachment purposes only, and that it was not for the purpose of ascertaining the defendant's state of mind, but for determining the reliability of the witness. Admission of that testimony was within the discretion of the trial court. *State v. Hull,* 182 Wash. 681, 48 P.2d 225 (1935); *State v. Goddard,* 56 Wn.2d 33, 351 P.2d 159 (1960). The jury was properly instructed as to its purpose. There was no error.

Defendant's other point is failure to give a requested instruction that no inference or presumption should be drawn because of motions, exceptions or objections by counsel. The court felt that it was self–evident to the jurors that it was the function of a lawyer to do those things. Defendant argues that such instruction was approved in *State v. Vindhurst,* 63 Wn.2d 607, 388 P.2d 552 (1964). That case did footnote such an instruction as ameliorating a possibly objectionable question. It did not approve the instruction and certainly did not mandate giving it. There was no error.

In summary, the defendant had a fair trial, in fact, two fair trials, presided over by experienced and able judges. One jury could not agree upon guilt. A second jury, with additional evidence, convicted defendant. We find no error.

The judgment is affirmed.

WRIGHT, C.J., ROSELLINI, STAFFORD, UTTER, HOROWITZ, DOLLIVER, and HICKS, JJ., and COCHRAN, J. Pro Tem., concur.

Petition for rehearing denied April 18, 1978.