
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  39568-5-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELIJAH S. SARGENT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Following a vehicle crash, Elijah Sargent was charged with second degree assault and driving under the influence (DUI).  The State alleged that he intentionally wrecked the vehicle he was driving in order to assault his passenger.  At trial, Sargent maintained that he was not the driver of the vehicle when it crashed and alternatively was not under the influence at the time of the accident.  A jury found him guilty of both charges.

Sargent appeals, raises four issues: (1) the court erred when it denied his motion for a mistrial based on a deputy's testimony that he was "impaired," (2) the prosecutor committed misconduct when it elicited testimony from a witness who testified that

Sargent failed to state he was not the driver at a prior CrR 3.5 hearing, (3) defense counsel was ineffective for failing to object to both above referenced pieces of testimony, and (4) we should remand to have the trial court strike the victim penalty assessment (VPA) and reconsider the imposition of interest on his ordered restitution.

We affirm Sargent's convictions but remand for the limited purpose of striking the VPA and interest on his restitution.

BACKGROUND

On the evening of April 9, 2022, Sargent and Elizabeth Simonson were involved in a serious car crash in Spokane Valley, Washington.

K.H.,[1] a witness to the crash, observed a vehicle "driving erratically," and then saw the car "fly in the air, hit a transformer, and fall on top of the roto rooters that were outside of Sunshine Rental." Rep. of Proc. (RP) at 125-26.[2] K.H. attempted to render aid to Simonson "who she observed crawling out of the vehicle, and then she opened the back door to grab her little dog." RP at 127. K.H. called 911.

---

[1] K.H. was a minor at the time of trial so we will refer to her by her initials.
[2] Unless otherwise noted, "RP" refers to the report of proceedings beginning on January 17, 2023.

At trial, K.H. identified Sargent as the driver and Simonson as the passenger due to the fact that Sargent "was stuck underneath the driver's seat, and [Simonson] had fallen out of the passenger's seat." RP at 130. K.H. also noted that prior to the crash, she "could see that the woman was in the passenger side because of her hair reflecting from the sun, the red on her hair."[3] RP at 133.

A recording of K.H.'s 911 call was played to the jury. During the call several frantic voices can be heard in the background and K.H. relays to the operator that "he was mad, he was mad, he pulled them off the road." Ex. 5 at 1 min. 27 sec. She later explained Simonson told her that Elijah Sargent "pulled the wheel off the road," causing the wreck. Exhibit 5 at 1 min. 53 sec.

Another witness, Alexus Rockstrom, saw the vehicle "as the car veered off the road and went up in the air, hit a power pole, and then, like, landed upside down." RP at 138. Rockstrom also identified Sargent as the driver and Simonson as the passenger. Rockstrom's 911 call was also played to the jury. In this call Rockstrom relays that the female passenger is outside the vehicle but the male driver is trapped in the vehicle.

---

[3] Although K.H. and Alexus Rockstrom believed Ms. Simonson's hair was red, another witness described her hair as blonde, and Simonson's hair appears to have blonde coloring in the body camera footage from the night of the crash.

First responders quickly arrived on scene. Simonson told police she was a passenger in the vehicle when it crashed, and that it "was her boyfriend's[4] car." RP at 165. Deputy Garrett Spencer arrived at the scene and observed Sargent making his way toward the open back right passenger side door of the vehicle.

Sargent was charged with second degree assault, and DUI.

### 1. *CrR 3.5 Hearing*

Prior to trial, a CrR 3.5 hearing was held to determine the admissibility of statements Sargent made to police at the hospital about his relationship with Simonson. Deputy Spencer testified that he advised Sargent of his *Miranda*[5] rights at the scene and asked Sargent questions about his relationship with Simonson at the hospital. Sargent told Deputy Spencer that he and Simonson had previously been in an intimate dating relationship. Deputy Spencer was cross-examined on whether Sargent was coherent enough at the scene to understand the *Miranda* warnings.

During the CrR 3.5 hearing, the court advised Sargent of his rights and the consequences if he testified at the hearing:

> THE COURT: All right. Mr. Sargent, so now it's my duty to inform you, sir, that you may but you need not testify at this hearing today on the circumstances surrounding the statements. If you do testify at today's hearing, you will be subject to cross-examination with respect to the

---

[4] The owner of the car was identified as someone other than Sargent.
[5] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

4

circumstances surrounding the statement and with respect to your credibility.

If you do testify at today's hearing, you do not, by so testifying, waive your right to remain silent during trial. If you do testify at today's hearing, neither this fact nor your testimony at the hearing shall be mentioned to the jury unless you testify concerning the statement.

RP (Jan. 3, 2023) at 130.

Sargent testified at the hearing that he did not remember many of the events prior to the crash and did not remember being read his *Miranda* warnings:

[DEFENSE COUNSEL:] Do you remember being in a vehicle crash back in April 9th of 2022?

[SARGENT:] I remember being in the hospital, told the vehicle was crashed.

[DEFENSE COUNSEL:] Do you remember anything before that since the crash?

[SARGENT:] I remember us leaving the Wendy's and getting into an argument. And after that, it kind of quickly goes blank till the hospital.

[DEFENSE COUNSEL:] So after the crash occurred, the next thing that you remember is being in the hospital?

[SARGENT:] Yeah, waking up in Deaconess.

[DEFENSE COUNSEL:] Do you remember talking to Deputy Spencer that day?

[SARGENT:] I remember talking to him in the hospital room.

[DEFENSE COUNSEL:] Do you remember talking to him while he read you your [*Miranda*] warnings?

[SARGENT:] I do not.

> [DEFENSE COUNSEL:] Do you remember being transported to the hospital?

> [SARGENT:] Vaguely, thinking back on it, kind of but not really. Kind of just, like, came lucid for a second and then blacked back out, woke up in the hospital.

RP (Jan. 3, 2023) at 131-32. The court ultimately ruled Sargent's statements to police were admissible.

*Trial*

At trial, the witnesses testified consistent with the above narrative. Simonson did not testify, but many of her statements at the scene were admitted as non-testimonial hearsay exceptions that are not challenged on appeal.

Deputy Spencer testified at trial. He discussed his training and experience, explaining that in addition to his position as a law enforcement officer, he was also a certified collision technician, a drug recognition expert (DRE), and a standardized field sobriety test instructor. Deputy Spencer estimated that he had conducted "thousands" of DUI investigations over the course of his career.

Deputy Spencer was then asked about his observations upon arriving on scene the night Sargent was arrested. He testified that he was one of the first responders on scene and saw a car on its roof with the right rear passenger door open. He saw Simonson on her phone and described her as frantic and hysterical. As he walked up to her, she said something like, "I can't believe he did this." RP at 192.

6

Deputy Spencer then saw Sargent in the backseat area of the car, making his way, on the roof, toward the open right passenger side door of the vehicle. Once outside the car, Deputy Spencer walked Sargent, who appeared to be disoriented but steady on his feet, to the medics. Sargent was placed on a gurney, and Deputy Spencer watched as they took Sargent's vital signs and checked him for injuries. Deputy Spencer observed that Sargent's vital signs were normal, which Deputy Spencer described as "unusual," noting that in his experience when people who are not impaired are involved in serious collisions their blood pressure and pulse are elevated not normal.

Deputy Spencer then conducted a pupil dilation test and noticed that Sargent's pupils were extremely constricted. He searched Sargent's pants and found "a small metal tin" in Sargent's "right pocket" that contained fentanyl pills.

Deputy Spencer testified that "when I shined my pen light . . . they had little to no reaction to the light and . . . they were extremely constricted." RP at 195-96. Deputy Spencer testified this was significant because it was consistent with "somebody who's under the influence of a narcotic analgesic." RP at 196. Deputy Spencer was then asked:

> [THE STATE:] After evaluating Mr. Sargent's pupils, as a DRE, did you form any opinions?
>
> [DEPUTY SPENCER:] Yes.
>
> [THE STATE:] What was the opinion that you made at the scene?

7

[DEPUTY SPENCER:] My opinion was that he was impaired by a drug, a drug category consistent with a narcotic analgesic.

RP at 196. Sargent did not object to this testimony.

*Darlene Valencia's Testimony*

The State called Darlene Valencia, a forensic scientist with the Washington State Patrol, as a witness. Valencia tested a blood sample taken from Sargent after the crash. She testified that Sargent's blood tested positive for five different drugs: "amphetamine, methamphetamine, morphine, fentanyl, and Norfentanyl." RP at 239.

Valencia went on to testify that "amphetamine and methamphetamine are known as central nervous system stimulants" and typically have two phases: an up phase and a down phase. RP at 246. She testified "[i]n relation to driving with the up phase, generally what we see is speeding, weaving in and out of traffic; whereas, in the down phase, you could see someone fall asleep at the wheel or not able to maintain lane position." RP at 246.

On the other hand, Valencia testified that Fentanyl, Norfentanyl, and morphine are known as narcotic analgesics. "[T]he general [effects] of these are pretty much a lot like the down phase of central nervous stimulants. So you're going to be very lethargic, fatigued, tired, sedated." RP at 246. She testified "central nervous stimulants are going to dilate your pupils" while "narcotic analgesics will constrict the pupils." RP at 247.

After providing a few more general examples of the possible effects of these types of drugs on the human body, Valencia declined to provide an opinion on whether the level of drugs in Sargent's system would have impaired his ability to drive because she did not know his tolerance levels.

*Motion for Mistrial*

After the State rested, and outside the presence of the jury, Sargent moved for "a mistrial or for a dismissal" of the DUI charge. RP at 261-62. Sargent based his mistrial motion on Deputy Spencer's testimony that Sargent was "impaired." RP at 262-63. Defense counsel argued:

> Based on the DUI charge, we're arguing for a mistrial that in the defense's opinion, based on the testimony that we've heard from Deputy Spencer, that there was just the one test conducted of looking into Mr. Sargent's eyes and seeing the constricted pupils and nonreactive to light. It's essentially synonymous with *State v. Quaale*[6], that in that case, the trooper's opinion was just based on one test of the horizontal gaze nystagmus [HGN] test, and that he essentially concluded that there was impairment based on that one test. So we are moving for a mistrial based on that opinion testimony.

RP at 262-63.

The court found *Quaale* was distinguishable from Sargent's case and denied the motion for a mistrial.

---

[6] 182 Wn.2d 191, 340 P.3d 213 (2014).

*Sargent's Testimony*

Sargent testified that Simonson was the one driving the vehicle when it crashed. Sargent stated that Simonson went to Wendy's, and he walked across the parking lot to the Hico Mart, on the night of the crash. He testified that after leaving the Hico Mart, he met back up with Simonson at Wendy's, and he "got in [the car] on the passenger side." The two left "westbound on Barker until we hit Sprague and then—or going southbound on Barker until we hit Sprague and then we started going westbound." RP at 291. He further stated:

> [SARGENT:] Shortly as we hit the road, she went to get on a freeway entrance ramp and then changed lanes into an off-coming ramp. We got into a minor argument about it, so she flipped the car around and decided to go just to Sprague, that way we could take that way.
>
> [DEFENSE COUNSEL:] And when you say "she flipped the car around" what do you mean by that?
>
> [SARGENT:] She pulled over and then just, like, pulled a u-ey.
>
> [DEFENSE COUNSEL:] Where were you going when you left the Hico and Wendy''?
>
> [SARGENT:] From there, we discussed to go to my family's house, then her mother's house, then back to her apartment.
>
> . . .
>
> [DEFENSE COUNSEL:] Okay. And did you end up getting to where you were going?
>
> [SARGENT:] We did not. Part of the argument started back up as we hit Sprague and she reached over from the driver's seat to the passenger's seat and grabbed her dog off my lap. Following that, I don't remember too much.
>
> . . .

10

[DEFENSE COUNSEL:] Okay. And you said that you were in the passenger's seat. Correct?

[SARGENT:] Yes, I was.

[DEFENSE COUNSEL:] And were you holding the dog?

[SARGENT:] Yes.

[DEFENSE COUNSEL:] Okay. And then you said you got into an argument. Correct?

[SARGENT:] Yes.

[DEFENSE COUNSEL:] Can you describe how Simonson was able to grab the dog off your lap?

[SARGENT:] Like I said, she reached over from the driver's seat to the passenger's seat with both arms and kind of snatched him away from me.

[DEFENSE COUNSEL:] Okay. What happened after that?

[SARGENT:] Like I said, I don't remember very much because that's what I think caused the accident.

[DEFENSE COUNSEL:] What is the next thing that you do remember?

[SARGENT:] Having a conversation with Deputy Spencer in the hospital.

RP at 291-94.

During cross-examination, the State pointed out that Sargent's ability to recall details during his trial testimony conflicted with his vague testimony at the CrR 3.5 hearing:

[THE STATE:] Okay. Now, during your testimony with [defense counsel] Mr. Sargent, you seemed to provide quite a bit of detail about what happened between when you were at the Wendy's with Ms. Simonson and the crash when—is that correct?

[SARGENT:] Yes.

[THE STATE:] So in your testimony, you talked about the nature of the argument, as well as what street you were driving on and where you were headed, the incident with trying to get on the freeway and those types of things.  Right?

[SARGENT:] Yes.

[THE STATE:] So is it fair to say that you have a pretty good memory of what happened between leaving the Wendy's until the crash?

[SARGENT:] Yes.

[THE STATE:] Okay.  So when did that change, your memory?

[SARGENT:] My memory is only affected by the crash.  After the dog was grabbed, I don't remember much because what I assume was the concussion.

[THE STATE:] Now, is it correct, Mr. Sargent, that you've testified a couple of weeks ago in a different hearing in this case?

[SARGENT:] Yes.

[THE STATE:] Do you remember your testimony from that hearing?

[SARGENT:] Vaguely.  It hadn't changed much.

[THE STATE:] So why did you testify at that hearing that you didn't remember anything between leaving the Wendy's and waking up in the hospital?

[SARGENT:] I don't believe I testified to that.

[THE STATE:] Okay.  You deny you made any testimony of that nature?

[SARGENT:] Yes.

RP at 299-300.

*Recall of Deputy Spencer*

Following Sargent's testimony, the State briefly recalled Deputy Spencer as a rebuttal witness.  RP at 301.  The State asked Deputy Spencer:

[THE STATE:] Deputy Spencer, do you recall being present in court for a hearing related to this matter a week before last?

[DEPUTY SPENCER:] Yes.

[THE STATE:] Were you present when Mr. Sargent testified at that prior hearing?

[DEPUTY SPENCER:] I was.

. . .

[THE STATE:] During that hearing, was there any testimony or questions for Mr. Sargent about the events leading up to the crash?

[DEPUTY SPENCER:] Yes.

[THE STATE:] Did Mr. Sargent say anything about Ms. Simonson driving the vehicle?

[DEPUTY SPENCER:] Not to my recollection.

[THE STATE:] Did Mr. Sargent give any testimony about what he remembered leading up to the crash on April 9th?

[DEPUTY SPENCER:] Yes.

[THE STATE:] What did he say?

[DEPUTY SPENCER:] As far as I can recall, he stated that he remembered leaving the Wendy's, but didn't remember anything else until the hospital.

RP at 304-05. During cross-examination, defense counsel asked:

[DEFENSE COUNSEL:] Deputy Spencer, would you say it's fair that the testimony that was given at the prior hearing was pretty limited?

[DEPUTY SPENCER:] Yes.

RP at 306.

The jury was instructed that to convict Sargent of DUI, it had to find "beyond a reasonable doubt . . . [t]hat the defendant drove a motor vehicle [while] . . . under the influence of or affected by a drug." RP at 314. In closing, defense counsel

13

acknowledged that there was a bad accident but challenged the State's evidence and lack of evidence that Sargent was the driver. With respect to the evidence of Sargent's impairment, defense counsel argued that Deputy Spencer's opinion was not credible because he did not conduct any field sobriety tests. Counsel also pointed to Valencia's testimony, arguing to the jury, that there was not enough to show that Sargent was definitively impaired.

*Verdict & Sentencing*

Following trial, the jury found Sargent guilty of assault in the second degree and DUI.[7]

The court sentenced Sargent to 38 months of incarceration and 18 months of community custody. The court found Sargent to be indigent and imposed the then mandatory $500 VPA and $753.77 of restitution. Sargent's judgment and sentence states, "The restitution obligations imposed in this judgment shall bear interest from the date of the judgment until payment in full, at the rate applicable to civil judgments." Clerk's Papers at 68.

Sargent timely appeals.

---

[7] The jury also returned a special verdict that Sargent and Simonson were intimate partners.

ANALYSIS

1.  MOTION FOR MISTRIAL BASED ON OPINION OF IMPAIRMENT

Sargent argues that the court erred in denying his motion for a mistrial.  On appeal he contends that Deputy Spencer's opinion testimony, that Sargent was impaired, was improper for two reasons.  First, the opinion was unreliable as it was based solely on Deputy Spencer's observation of Sargent's pupils.  Second, he argues that the opinion amounted to an improper opinion of guilt.  The State responds that the opinion was based on more than pupil dilation, Sargent waived any claim that the testimony amounted to an opinion of guilt by failing to raise the issue below, and regardless the opinion was proper.

As a preliminary matter we must determine the scope of our review.  The State argues that Sargent has waived any claim that Deputy Spencer's opinion amounted to an improper opinion of guilt.  The State points out that Sargent's motion for a mistrial was limited to a claim that Deputy Spencer's opinion testimony was improper because it was based solely on a pupil dilation test.  We agree.  Sargent argued that his case was essentially synonymous with *Quaale* because in both cases the officer's opinion of impairment was based on one test.  He did not argue that the opinion testimony also amounted to an improper opinion of guilt.

RAP 2.5(a) allows this court to "refuse to review any claim of error which was not raised in the trial court."  "A party may assign evidentiary error on appeal only on a specific ground made at trial."  *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125

(2007). The purpose of this rule is to give the trial court the opportunity to cure the error. *Id.* Here, Sargent did not ask the trial court to consider whether Deputy Spencer's testimony amounted to an improper opinion of guilt. While he raises this issue for the first time on appeal, Sargent does not argue that an exception to the rule of waiver should apply.

We also note that Sargent did not object to Deputy Spencer's opinion at the time of his testimony. Instead, after the State rested, Sargent moved for a mistrial on the DUI charge. Thus, our analysis on appeal is about whether the opinion testimony prejudiced Sargent to such an extent that nothing short of a new trial would insure a fair trial on the charge of DUI. *State v. Mak*, 105 Wn.2d 692, 701, 718 P.2d 407 (1986).

We review the grant or denial of a motion for a mistrial for abuse of discretion. *State v. Jackson*, 150 Wn.2d 251, 276, 76 P.3d 217 (2003). We first consider whether Deputy Spencer's testimony was admissible. If there was no error in admitting the testimony then it was not an abuse of discretion to deny the motion for a mistrial. *Id.*

Our Supreme Court has held that the DRE protocol, including the horizontal gaze nystagmus test (HGN) meets the *Frye*[8] standard for admissibility. *State v. Baity*, 140 Wn.2d 1, 14-15, 991 P.2d 1151 (2000). Nevertheless, the court placed limitations on the admissibility of the HGN test. The "officer may not testify in a fashion that casts an aura

---

[8] *Frye v. United States*, 293 F. 1013, 34 A.L.R. 145 (1923).

of scientific certainty to the testimony, [and t]he officer also may not predict the specific level of drugs present in a suspect." *Id*. at 17. On the other hand, the officer "may . . . relate an opinion about the presence or absence of certain categories of drugs in a suspect's system." *Id*. at 18.

In *Quaale*, a trooper was asked whether the defendant was too impaired to operate a motor vehicle based solely on the results of the HGN test. 182 Wn.2d at 195. Over the defendant's objection the trooper testified that "there was no doubt [the defendant] was impaired." *Id*. Ultimately, the Supreme Court concluded that the trooper's opinion testimony was inadmissible because it violated the limitations set by *Baity* in two ways. First, by testifying that the results of the HGN test left him with "no doubt" about his conclusion, the trooper "improperly gave the appearance that the HGN test may produce scientific[ ] certain results." *Id*. at 198-199. In addition, by testifying that the defendant was "'impaired,'" the trooper suggested that the defendant consumed a sufficient level of intoxicants to be impaired. *Id*. at 199.

At trial and on appeal, Sargent argued that Deputy Spencer's testimony, that Sargent was impaired, was likewise inadmissible because it was based solely on pupil dilation and suggested this test could produce certain results of a specific level. We conclude that *Quaale* is distinguishable in several respects.

First, Sargent fails to demonstrate that Deputy Spencer's opinion was based solely on a pupil dilation test. After testifying to his training and experience, Deputy Spencer

17

testified that he was one of the first responders on scene and saw a car on its roof with the right rear passenger door open. He saw Simonsen outside of the vehicle and she told him that she was the passenger. He then observed Sargent crawl out of the open right rear passenger door and appear disoriented with vital signs abnormal under the circumstances and constricted pupils. Deputy Spencer was then asked, "After evaluating Mr. Sargent's pupils, as a DRE, did you form any opinions?" RP at 196. The qualifier in the question was temporal not foundational. Deputy Spencer was not asked, and never testified, that his opinion was based solely on his observations of Sargent's pupils.

Second, there is nothing in the record to indicate whether a pupil dilation test is similar in scientific novelty to an HGN test and thus limited to the same restrictions as outlined in *Baity*. Third, Deputy Spencer's opinion did not cast an "aura of scientific certainty." *Baity*, 140 Wn.2d at 17. Deputy Spencer did not express that the results of one scientific test left him with "no doubt" about Sargent's impairment or suggest such degree of certainty in other ways. *See Quaale*, 182 Wn.2d at 198-99. Instead, he testified, "My opinion was that he was impaired by a drug, a drug category consistent with a narcotic analgesic." RP at 196.

Still, Sargent contends that Deputy's Spencer's testimony that Sargent was "impaired" conveyed a specific level of affectation deemed improper by *Quaale*. As noted above, *Quaale* held that while the HGN test could be used as evidence that a person was demonstrating characteristics of a particular type of drug, it could not be used

18

to "predict the specific level of drugs present in a suspect." *Quaale*, at 198. Deputy

Spencer's testimony here is distinguishable from that prohibited in *Quaale*. Deputy

Spencer's opinion was not based solely on the HGN test and his opinion did not expound

on whether Sargent's ability to drive was impaired. Nor was the jury instructed that

impairment was the legal standard.

But even if Deputy Spencer's opinion on impairment was improperly admitted, as

an indirect opinion on a specific level of intoxication, the improper opinion was not

sufficient to support a mistrial. In considering whether a trial irregularity warrants a new

trial, we look at three factors: "(1) the seriousness of the irregularity; (2) whether the

statement was cumulative of evidence properly admitted; and (3) whether the irregularity

could be cured by an instruction." *State v. Post*, 118 Wn.2d 596, 620, 826 P.2d 172

(1992).

Here, assuming there was an irregularity, it was not serious. Instead, to the extent

Deputy Spencer conveyed an opinion on the specific level of intoxication, the opinion

was indirect. There is no dispute that Deputy Spencer could testify that Sargent was

exhibiting the effects of having consumed certain drugs. While Deputy Spencer opined

that Sargent was impaired by a drug category consistent with a narcotic analgesic, he did

not indicate a specific level of impairment and did not suggest that the level of

impairment would affect Sargent's ability to drive. In addition, impairment was not the

central issue of the charge. Instead, Sargent's main defense was that he was not driving at the time of the accident.

Moreover, the opinion was cumulative. Additional evidence of affectation included testimony about the motive and severity of the crash, Deputy Sargent's observations, and the testimony of Valencia, the forensic scientist who testified that Sargent's blood tested positive for five different drugs. When asked whether "a person with Mr. Sargent's blood content of any one of these drugs individually would have an impaired ability to drive?" Valencia replied, "[Y]es, there are studies out there about morphine, for fentanyl, for methamphetamine individually, and in relation to driving, and there are statistics on the increased risk of an accident. And so, yes, so individually, they—they can be." RP at 249. Though she would not give an opinion as to whether the drugs in Sargent's system would impair his ability to drive, because she did not know his tolerance level, she did testify to the effects of these various drugs generally and noted that a person affected by narcotic analgesics will have constricted pupils.

Finally, the irregularity could have been cured by an instruction, especially if Sargent had objected at the time of Valencia's opinion and moved to strike the testimony. Assuming the court found her opinion inadmissible, the court could have instructed the jury to disregard the testimony. Moreover, even after his motion for a mistrial was denied, Sargent could have sought a curative instruction.

The court did not abuse its discretion when it denied Sargent's motion for a mistrial.

2.   PROSECUTORIAL MISCONDUCT

Sargent argues the prosecutor committed misconduct by improperly commenting on his right to silence. Specifically, he points to the elicitation of testimony through Deputy Spencer that at a prior hearing Sargent did not deny driving the vehicle. The State responds that Sargent failed to object and that by testifying at both the hearing and trial, Sargent waived his right to silence and was subject to impeachment.

A defendant claiming prosecutorial misconduct must show the prosecutor's conduct was improper and prejudicial. *State v. Walker*, 182 Wn.2d 463, 477, 341 P.3d 976 (2015). When a defendant fails to object, we will reverse for prosecutorial misconduct during closing only if "the remark is so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994). "In other words, a conviction must be reversed only if there is a substantial likelihood that the alleged prosecutorial misconduct affected the verdict." *Id*.

Under this heightened standard, a defendant who fails to object to misconduct at trial must show more than impropriety and prejudice to succeed on appeal. *State v. Loughbom*, 196 Wn.2d 64, 74-75, 470 P.3d 499 (2020). Instead, the defendant must show that the misconduct was flagrant and ill-intentioned, and that the resulting prejudice

21

was incurable. *State v. Crossguns*, 199 Wn.2d 282, 299, 505 P.3d 529 (2022). This

requires the defendant to show that "'no curative instruction would have obviated any

prejudicial effect on the jury' and that 'the misconduct resulted in prejudice that had a

substantial likelihood of affecting the jury verdict.'" *Id*. (quoting *State v. Emery*, 174

Wn.2d 741, 761, 278 P.3d 653 (2012)) (internal quotation marks omitted).

Under this heightened standard, incurable prejudice has only been found "'in a

narrow set of cases where we were concerned about the jury drawing improper inferences

from the evidence.'" *Loughbom*, 196 Wn.2d at 74, (quoting *In re Pers. Restraint of*

*Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018)). The Supreme Court has recognized

reversible misconduct under this heightened standard when the misconduct is either so

inflammatory that it threatens the fundamental fairness of trial, or when it is so severe as

to demonstrate that it was flagrant and ill intentioned. *See Phelps*, 190 Wn.2d at 171.

A defendant's "right to silence is derived from the Fifth Amendment, applicable to

the State[ ] [through] the Fourteenth Amendment , and article I, section 9 of the

Washington Constitution." *State v. Romero*, 113 Wn, App. 779, 786, 54 P.3d 1255

(2002). The applicable amendment and associated analysis depend on when the silence

occurred and whether it is being used as substantive evidence of guilt or as impeachment

evidence.

"The Fifth Amendment prohibits impeachment based upon the exercise of silence

where the accused does not waive the right and does not testify at trial." *State v. Burke*,

163 Wn.2d 204, 217, 181 P.3d 1 (2008).  When a defendant testifies at trial, pre-arrest

silence may be used, but only to impeach his testimony.  *Id*.  Post-*Miranda* silence cannot

be used, even for impeachment.  *Id*.  In a post-*Miranda* scenario, a defendant's failure to

answer some interrogation questions is viewed as an invocation of the right to remain

silent and cannot be used as either substantive or for impeachment evidence.  *State v.*

*Fuller*, 169 Wn. App. 797, 815, 282 P.3d 126 (2012).  Silence in response to questioning

is presumed to be reliance on *Miranda* warnings.  *See State v. Young*, 89 Wn.2d 613, 621,

574 P.2d 1171 (1978).  Likewise, the State cannot comment on a defendant's failure,

post-arrest, to come forward with an explanation.  *State v. Heller*, 58 Wn. App. 414, 418-

19, 793 P.2d 461 (1990).

However, once a defendant waives the right to remain silent and makes post-

*Miranda* statements, the defendant's subsequent testimony at trial can be impeached with

the earlier inconsistent statements.  *State v. Belgarde*, 110 Wn.2d 504, 511, 755 P.2d 174

(1988).  And when "'a defendant voluntarily offers information to police [post-*Miranda*],

his toying with the authorities by allegedly telling only part of his story is certainly not

protected by *Miranda* or *Doyle*.[9]'"  *Young*, 89 Wn.2d at 621 (quoting *State v. Osborne*,

50 Ohio St.2d 211, 364 N.E.2d 216, 217 (1977)).  Similarly, when a defendant provides a

denial in one form and asserts a different version at trial, the "'partial silence' at the time

---

[9] *Doyle v. Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976).

23

of the initial statement is not insolubly ambiguous, but 'strongly suggests a fabricated defense and the silence properly impeaches the later defense.'" *Belgarde*, 110 Wn.2d at 511-12 (quoting *State v. Cosden*, 18 Wn. App. 213, 221, 568 P.2d 802 (1977)).

In this case, Sargent was advised of his rights before he chose to testify at the CrR 3.5 hearing. He chose to waive his right to remain silent and voluntarily testified to a version of events before the accident. His trial testimony differed from his testimony at the CrR 3.5 hearing. Not only did he provide more details at trial, despite his earlier claim of not remembering much before the accident, he testified at trial that he was the passenger, not the driver. At the very least his testimony about being a passenger was omitted in his prior explanation. Arguably, however, his trial testimony about sitting in the passenger seat with a dog on his lap was inconsistent with his CrR 3.5 testimony where he was unable to recall any details about what happened but instead claimed that he was "told the vehicle was crashed." RP (Jan. 3, 2023) at 131. It was not improper for the State to impeach Sargent on his inconsistent testimony and draw unfavorable inferences from his failure to include crucial exculpatory information that he later related at trial. *See State v. Gutierrez*, 50 Wn. App. 583, 589, 749 P.2d 213 (1988).

We disagree with Sargent that his case is controlled by *State v. Fricks*, 91 Wn.2d 391, 588 P.2d 1328 (1979). In *Fricks*, the prosecutor elicited testimony from police that the defendant did not make any statements after being arrested. The court held that using the defendant's post-arrest silence as substantive evidence of guilt violated the

defendant's due process rights. *Id.* at 395. *Fricks* did not concern post-arrest statements volunteered by a defendant after waiving *Miranda* rights.

Sargent also argues that his testimony at the CrR 3.5 hearing was focused on the circumstances surrounding his post-arrest statements and he had no reason to discuss whether he was driving. Sargent does not explain how his intentions would exempt him from impeachment. *See State v. Smith*, 15 Wn. App. 103, 106, 547 P.2d 299 (1976) ("Under CrR 3.5 . . . if a defendant does testify at trial concerning the statement, then the prosecution may cross-examine the defendant at trial as 'any other witness.'").

Sargent fails to show that the prosecutor improperly commented on his right to silence and alternatively fails to show that any such error was incurable.

3.   INEFFECTIVE ASSISTANCE OF COUNSEL

Sargent argues he was afforded ineffective assistance of counsel because defense counsel failed to object to (1) Deputy Spencer's testimony that he was "impaired," and (2) the prosecutor's question to Deputy Spencer regarding the CrR 3.5 hearing. We should disagree.

Defendants have a constitutionally guaranteed right to effective assistance of counsel. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Lopez*, 190 Wn.2d 104, 115, 410 P.3d 1117 (2018). A claim of ineffective assistance of counsel is an issue of constitutional magnitude that may be considered for the first time on appeal. *State v.*

*Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). Ineffective assistance of counsel claims

are reviewed de novo. *State v. White*, 80 Wn. App. 406, 410, 907 P.2d 310 (1995).

Here, Sargent bears the burden of showing (1) that his counsel's performance "fell

below an objective standard of reasonableness based on consideration of all the

circumstances" and, if so, (2) "there is a reasonable probability that [but for counsel's

poor performance, the outcome] of the proceeding would have been different." *State v.*

*McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). "If either element . . . is not

satisfied, the inquiry ends." *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

A defendant alleging ineffective assistance of counsel bears the burden of showing

deficient representation. *McFarland*, 127 Wn.2d at 335. In reviewing the record, there is

a strong presumption that counsel's performance was reasonable. *Id*. "The

reasonableness of counsel's performance is to be evaluated from counsel's perspective at

the time of the alleged error and in light of all the circumstances." *Kimmelman v.*

*Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). "When

counsel's conduct can be characterized as a legitimate trial strategy or tactic[ ],

performance is not deficient." *Kyllo*, 166 Wn.2d at 863.

In order for a defendant to prevail on a claim of ineffective assistance of counsel

based on a failure to object, they must show (1) the absence of legitimate strategic or

tactical reason for not objecting; (2) the trial court would have sustained the objection if

26

made; and (3) if the evidence had not been admitted, the trial result would have been different. *State v. Saunders,* 91 Wn. App. 575, 578, 958 P.2d 364 (1998).

Even if we find that counsel's performance was deficient, a defendant must affirmatively prove prejudice. *State v. Thomas*, 109 Wn.2d 222, 225, 743 P.2d 816 (1987). This requires more than simply showing "that the errors had some conceivable effect on the outcome." *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A defendant demonstrates prejudice by showing that the proceedings "would have been different but for counsel's deficient representation." *McFarland*, 127 Wn.2d at 337.

Sargent first argues his counsel was ineffective for failing to object to Deputy Spencer's testimony that he was "impaired." This argument fails. As discussed above, Sargent's counsel made a tactical decision to attack the opinion testimony by moving for a mistrial. It is a legitimate trial strategy to avoid objecting to damaging testimony so as not to draw attention to it. Further, even if this tactical decision was deficient, Sargent fails to show that the outcome of the trial would have been different had he objected at the time Deputy Spencer provided the opinion. As we noted above, even if there was error, it was not significant and the evidence was redundant.

Second, Sargent argues counsel was ineffective for failing to object to the State's questioning of Deputy Spencer regarding the fact that Sargent never testified at the CrR 3.5 hearing that Ms. Simonson was the one driving. This argument also fails. The failure

to object is generally considered a strategic decision. Sargent fails to demonstrate that an objection would have been sustained. Additionally, defense counsel effectively rehabilitated Sargent by pointing out the testimony at the CrR 3.5 hearing was limited.

Sargent has failed to demonstrate that his attorney was constitutionally ineffective.

4. LEGAL FINANCIAL OBLIGATIONS (LFOs)

Sargent requests we remand his case so the trial court can strike the VPA from his judgment and sentence. The State concedes. Sargent also requests we remand so the court can exercise its discretion in imposing interest on his ordered restitution. The State concedes but also posits we can strike the restitution interest now. We accept the State's concession and remand for the limited purpose of striking the VPA and restitution interest.

Former RCW 7.68.035(1)(a) (2018) required a VPA be imposed on any individual found guilty of a crime in superior court. In April 2023, the legislature amended RCW 7.68.035 to prohibit the imposition of the VPA on indigent defendants. *See* LAWS OF 2023, ch. 449, § 1, took effect on July 1, 2023.

Similarly, former RCW 10.82.090 (2018) required interest be imposed on restitution without exception. However, effective January 1, 2023, the statute was amended to say "The court may elect not to impose interest on any restitution the court orders." RCW 10.82.090(2) (2023). Amendments to statutes that impose costs upon convictions apply prospectively to cases pending appeal. *See State v. Ramirez*, 191 Wn.2d 732, 748-49, 426 P.3d 714 (2018).

28

No. 39568-5-III
*State v. Sargent*

Because Sargent's case is pending on direct appeal, the amendments apply. Below, the court found Sargent to be indigent, he was ordered to pay restitution, and his judgment and sentence mandated that interest accrue on the restitution until it is paid in full. The State concedes that these recent changes apply and requests that we strike the fee and interest rather than remand for reconsideration. We accept the State's concession and proposed resolution.

Affirmed but remanded to strike the VPA and interest on restitution.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____       _____
Lawrence-Berrey, C.J.                                          Hill, J.[†]

---

[†] Tyson R. Hill, an active judge of a court of general jurisdiction, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1).

29